**Robert Gene GARZA, Appellant,**

v.

**The STATE of Texas.**

**Nos. AP–74935, AP–75597.**

Court of Criminal Appeals of Texas.

Jan. 31, 2007.

---

Noel Gonzalez, Pharr, for Appellant.

Theodore C. Hake, Asst. Crim. D.A., Edinburg, Matthew Paul, State's Attorney, Austin, for State.

## OPINION

PRICE, J., delivered the opinion of the Court in which KELLER, P.J., and MEYERS, JOHNSON, KEASLER, HERVEY, HOLCOMB, and COCHRAN, JJ., joined.

In December 2003, the appellant was convicted of two counts of capital murder.[1] Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071, sections 2(b) and 2(e), the trial judge sentenced the appellant to death for each count.[2] Direct appeal to this Court is automatic.[3] The appellant raises five points of error. Finding no merit in any of these points of error, we will affirm the judgment of the trial court with respect to the conviction for capital murder.

## STATEMENT OF FACTS

On the evening of September 4, 2002, Maria De La Luz Bazaldua Cobbarubias, Danitzene Lizeth Vasquez Beltran, Celina Linares Sanchez, Lourdes Yesenia Araujo Torres, Karla Espino Ramos, and Magda Torres Vasquez were working at Garcia's Bar in Donna, Texas. When the bar closed at midnight, Cobbarubias gave the other women a ride to their trailer home. She drove south on Business 83, turned onto Valley View Road, and then parked close to the women's trailer. Before anyone had a chance to get out of the vehicle, shots were fired. Cobbarubias, Beltran, Sanchez, and Torres sustained multiple gunshot wounds and died from their injuries. Ramos sustained gunshot wounds to her arm and leg, but survived. Vasquez did not sustain any physical injuries.

---

1. TEX. PENAL CODE § 19.03(a). The appellant was also convicted and sentenced to death for engaging in organized criminal activity under Texas Penal Code § 71.02. We will address the propriety of this second death penalty at the end of our opinion.

2. Art. 37.071, § 2(g). Unless otherwise indicated, all references to Articles refer to the Texas Code of Criminal Procedure.

3. Art. 37.071, § 2(h)

Alejandro Martinez of the Donna Police Department was the first officer to arrive at the scene. He determined that the shooting had actually occurred just outside the Donna city limits and contacted the Hidalgo County Sheriff's Office. Several witnesses told Martinez that a Chevrolet Blazer had been parked close to the trailer at the time of the shooting. The vehicle was white, had paper plates, and did not have any hubcaps.

Investigators with the Hidalgo County Sheriff's Office recovered sixty-one spent bullet casings from the trailer park, which were of two different sizes: 9 millimeter and 7.76 × 39 millimeter. Most of the casings were recovered from a driveway located directly behind where the victim's Pontiac Grand Am was parked. Investigators also impounded a Chevrolet Blazer a few miles from the trailer park. The vehicle was white, had paper plates, and did not have any hubcaps. It had been reported stolen a few days earlier. Several items of clothing that did not belong to the vehicle's owner were recovered from the vehicle, including a red bandana with white markings. The vehicle had run out of gas.

Juan Antonio Quintero, a neighbor, testified that he saw two people at the time of the shooting. One of them was short and "chubby" and the other one was tall and "skinny." Both of them were wearing black. He noticed that the short person was holding a gun that "looked like a TEC–9." He testified that he could not see their faces, but thought one of them "resembled" Vasquez's boyfriend, Jesse Munoz.

Carlos Villarreal, J.A. Quintero's guest, told investigators that he saw two people at the time of the shooting. One of them appeared to be between 5'10" and 5'11" and 160 pounds. The other person was 5'8" and 250 pounds. The State introduced the appellant's booking sheet which showed that the appellant was 5'11" and 160 pounds.

Investigator Juan Sifuentes testified that, because of information they had received, patrons at Garcia's Bar were suspected in the shooting. Ramos told investigators that Abraham Martinez Tienda, who had been in Garcia's Bar on the evening of the shooting, shot the women. Vasquez told investigators that she suspected her boyfriend, Juan Rudolfo Barrones, who had been in Garcia's Bar on the evening of the shooting. Another suspect was Antonio Francisco Conteras, because he had followed the victim's car to the trailer park on the evening of the shooting. Sifuentes testified that they investigated Tienda, Barrones, and Conteras, but could not find any evidence linking them to the shooting. They also investigated several other bar patrons and pursued tips they received from the Crime Stoppers program. However, this investigation did not lead anywhere, and after a few weeks they were left with no suspects.

In January 2003, Abraham Osequera and Marco Antonio Mendez told investigators that they believed that members from their criminal street gang, the TriCity Bombers, the "T.C.B.," could be involved. They gave investigators information pointing towards T.C.B. members Jesus Carlos Rodriguez and Mark Anthony Reyna. Also, investigators received information from J.A. Quintero and his aunt, Mercedes Quintero, implicating the T.C.B. Through further investigation, other T.C.B. members emerged as possible suspects including the appellant, Rudolfo Medrano, Guadalupe Guerra, and Ricardo Martinez.

The State's theory of the case was that J.C. Rodriguez, who was serving time for attempted murder, ordered "a hit" on Nora Rodriguez and M. Quintero because they had been called to testify against him, but that the wrong women were killed by

mistake.[4] N. Rodriguez testified that she and M. Quintero witnessed J.C. Rodriguez commit the attempted murder on March 31, 2001, and were called to testify about the incident. To support this theory, the State introduced a judgment showing that J.C. Rodriguez was sentenced to twenty years' imprisonment for an attempted murder committed on March 31, 2001.

On January 26, 2003, the appellant was taken to the Hidalgo County Sheriff's Office. After receiving *Miranda* warnings and signing a waiver, the appellant gave a statement describing his own involvement in "a hit" which "resulted in the death of four Donna [wo]mans." The appellant explained that the "hit was organized for us" and that someone left a four-door "Cutlas[s] or Regal" at Plaza Mall to be used in "the hit." The appellant was "hoping it would be left alone," but on September 5, 2002, he received instructions "that the hit was to be carried out that day." At approximately 7:00 p.m., Martinez picked up the appellant and Reyna in a four-door vehicle.[5] The appellant saw that Martinez had an AK–47, a TEC–9, and a nine-millimeter handgun in the trunk of the vehicle. They picked up a fourth person, "Manny," and drove "around Donna to see the bar which was located on old [highway] 83." [6] Then they left Donna to pick up a "second vehicle," which had been stolen. The appellant and Reyna got into the second vehicle and waited in the "middle of nowhere" until they saw "them" coming. They saw two vehicles pass by, a "Grand Am" and Manny's and Martinez's vehicle, and followed them to "a big house" or an "apartment complex." Martinez and Man-

ny got out of their vehicle and started shooting. The appellant saw that Manny "shot as he ran" and Martinez shot "as he [stood]." After the shooting, they left the scene and abandoned the four-door vehicle "in the middle of no[w]here." Then they left the weapons in the trash where they could pick them up the next day. They drove around in the second vehicle for a while until it "broke down," and they left on foot. Finally, the appellant stated: "A[p]parently Rocha was mad 'cause it wasn't done right." [7]

Medrano, who kept weapons for the T.C.B., told investigators that he knew where the weapons used in the Donna shooting were located. He directed investigators to a black box he kept in his grandparents' house. Also, he directed investigators to the residence of fellow T.C.B. member Robert Zamora, Jr. Zamora subsequently took investigators to his friend Nicholas Montez's residence. Firearms specialist Timothy Counce testified that a TEC–9 gun, which had been seized at Medrano's grandparents' house, fired eighteen of the nine-millimeter cartridge casings found at the scene. Further, Counce testified that he had been unable to "identify or eliminate" three Chinese-manufactured SKS military assault rifles, which had been seized at Montez's residence, as having fired the 7.76 × 39 millimeter cartridge casings found at the trailer park. The SKS rifles could appear to be AK–47 rifles to the untrained eye.

Detective Roberto Alvarez testified that the T.C.B. was a highly organized criminal street gang that was connected with various crimes including murder, robbery, as-

---

4. Nora Rodriguez was the manager of Garcia's Bar and was not related to J.C. Rodriguez.

5. It is unclear if this is the four-door Regal or Cutlass previously mentioned.

6. The record is not clear as to the identity of "Manny."

7. The record is not clear as to the identity of Rocha. However, J.C. Rodriguez's nickname was "Roach."

sault, burglary, and theft. Members identified themselves by the colors red and black; they often carried red bandannas, drove red cars, and wore red t-shirts. They commonly used a hand symbol and tattoos to show their affiliation with the gang. Alvarez testified that photographs depicting the appellant wearing red shirts and making the T.C.B. hand symbol confirmed his affiliation with the T.C.B., as did photographs of his tattoos. The tattoo photographs showed the words "Tri City Bomber" and the initials "T.C.B." on his chest, the words "tri" and "city" and a bomb with a fuse on his right shoulder blade, the initials "T.C.B." on his right leg, the nickname "bones" and a skull on his right arm, and a small bomb on his left arm. Over counsel's objection, the appellant was required to take off his shirt and display his tattoos to the jury.

## FACTUAL SUFFICIENCY

■ In his fourth point of error, the appellant contends that the evidence was factually insufficient to support the jury's finding of guilt. In a factual-sufficiency review, we review all of the evidence in a neutral light, and we will set the verdict aside only if the evidence is so weak that the verdict is clearly wrong and manifestly unjust, or the contrary evidence is so strong that the standard of proof beyond a reasonable doubt could not have been met.[8] A clearly wrong and unjust verdict occurs where the jury's finding is "manifestly unjust," "shocks the conscience," or "clearly demonstrates bias."[9]

■ The appellant was indicted for two capital felonies. In count one, he was indicted for knowingly or intentionally causing the deaths of Celina Linares Sanchez, Lourdes Yesenia Araujo Torres, Danitzene Liseth Vasquez Beltran, and Maria De La Luz Bazaldua Cobbarrubias, by shooting them with a firearm, during the same criminal transaction. In count four, he was indicted for knowingly or intentionally causing the death of the same four individuals by shooting them with a firearm during the same criminal transaction as a member of a criminal street gang. The charge authorized the jury to convict the appellant if it found that either he shot the victims with a firearm or he acted with intent to promote or assist Mark Anthony Reyna, Guadalupe Guerra, and Ricardo Martinez in committing capital murder, and the appellant did then and there solicit, encourage, direct, aid or attempt to aid Reyna, Guerra, and Martinez in committing the offense. Because the jury was charged on the law of the parties, proof that the appellant actually fired the fatal shots is not necessary.[10] The appellant argues that the evidence was insufficient because "aside from the tainted and coerced confession, there is no lawfully obtained evidence, physical or otherwise, linking [a]ppellant to the shooting."[11] However, in evaluating whether the evidence is sufficient to sustain a conviction, we consider all the evidence that the trial judge permitted the jury to consider, including erroneously admitted evidence.[12]

8. *Cain v. State,* 958 S.W.2d 404 (Tex.Crim. App.1997).

9. *Santellan v. State,* 939 S.W.2d 155, 164 (Tex.Crim.App.1997).

10. *Rabbani v. State,* 847 S.W.2d 555, 558–59 (Tex.Crim.App.1992).

11. In a single point, the appellant challenges the sufficiency of both capital charges. Because he does not distinguish them, neither shall we.

12. *Knox v. State,* 934 S.W.2d 678 (Tex.Crim. App.1996); *Gribble v. State,* 808 S.W.2d 65 (Tex.Crim.App.1990).

In his statement, the appellant admitted that he carried out "a hit" with Martinez, Reyna, and Manny, which "resulted in the death of four Donna [wo]mans." On September 5, 2002, they went to a bar in Donna located "off old [highway] 83." They followed a "Grand Am" to a "big house" or "apartment complex." Martinez and Manny were in a four-door vehicle that had several weapons in its trunk, including an AK–47 and a TEC–9. The appellant and Reyna were in a second, stolen vehicle, which later "broke down." The appellant saw that Manny "shot as he ran" and Martinez "as he [stood]." Afterwards, they left the scene and abandoned both vehicles. They left the weapons in the trash so that they could retrieve them later.

The State presented corroborating evidence that a shooting took place in the early morning hours of September 5, 2002, in a trailer park located in Hidalgo County just outside the Donna city limits. At least sixty-one shots had been fired at a parked Pontiac Grand Am. There were six women inside the vehicle and four of them died. The women worked at Garcia's Bar, located off Business 83 in Donna, and had just returned from work when the shooting occurred.

The forensic evidence also corroborated the appellant's statement. Counce testified that a TEC–9 fired eighteen of the nine-millimeter casings found at the scene. Also, he testified that three SKS rifles, which looked like AK–47 rifles, could have fired some of the 7.76 × 39 millimeter casings found at the scene. This was consistent with the appellant's observation of an AK–47 and a TEC–9 in the shooters' trunk. Also, the State showed that the TEC–9 gun was recovered from T.C.B. member Medrano's grandparents' house and that Medrano stored weapons for the T.C.B.

The appellant complains that witnesses at the scene identified other suspects as the shooters. However, under the law of the parties, the State was not required to prove that the appellant was one of the shooters. Also, the State showed that several of the other suspects were eliminated through further investigation. Finally, the appellant actually matched one of the witness's description of one of the shooters.

The appellant also complains that he stated that they used a four-door Cutlass or Regal, but that the State proved that the shooters used a Chevrolet Blazer. He argues that investigators did not find any evidence linking him to the Chevrolet Blazer. However, the appellant described the use of two vehicles in his statement, and only one of them was identified. The unidentified second vehicle was described as a stolen vehicle that "broke down." The State showed that the Chevrolet Blazer was stolen and had run out of gas. The State also showed that the appellant was a member of the T.C.B., that members of the T.C.B. wore red bandannas to identify themselves, and that a red bandanna not belonging to the vehicle's owner was recovered from the Chevrolet Blazer.

Although the State's evidence does not affirmatively show the appellant fired the fatal shots, at the very least the evidence established beyond a reasonable doubt his participation in the offense as a party. The evidence was not so weak that the verdict is clearly wrong and manifestly unjust, and the contrary evidence was not so strong that the standard of proof beyond a reasonable doubt could not have been met. Point of error four is overruled.

## ADMISSION OF INVOLUNTARY STATEMENT

■ In his first point of error, the appellant claims that the trial court erred in

denying his pre-trial motion to suppress his statement given to investigators on January 26, 2003. The appellant claims that his statement was obtained in violation of Articles 38.21 and 38.22 of the Texas Code of Criminal Procedure, the Fifth and Fourteenth Amendments to the United States Constitution, and Article I, sections 10 and 19 of the Texas Constitution. The appellant argues that the statement was involuntary because it resulted from "several substantial promises made and granted to [a]ppellant by the authorities." He complains about three specific promises purportedly made by investigators: (1) that he would be allowed to make telephone calls; (2) that he would be allowed a private contact visit with his pregnant wife; and (3) that he would be released from "the hole" to the general population.

 At a hearing on a motion to suppress, the trial court is the sole and exclusive trier of fact and judge of the credibility of witnesses as well as the weight to be given their testimony.[13] The trial judge may choose to believe or disbelieve any or all of a witness's testimony.[14] This Court is not at liberty to disturb any fact finding that is supported by the record.[15]

At the pre-trial hearing, the following amendment to the appellant's statement, which had been mailed to Investigator Sifuentes on July 24, 2003, was admitted into evidence:[16]

I am adding this to the statement just to make it clear that I did not com[mit] this crime. I only wrote what investigators told me, to get things I wanted. I wrote this statement to get a visit with my wife Jennifer M. Garza in person (con-

tact visit). I got a meal, and I was in the hole like everybody else who got arrested with me on 1-24-03. But I wrote what they told me to write so they could also move me out of the hole to regular population. But I just want to make it clear I don't know nothing about the murders. I only write what investigators told me for my be[n]efits, in exchange. Now I know the [serious]sness of the whole situation and know that it was wrong to write what they told me to get these things that are not a[l]lowed in the jail.

The appellant's testimony at the hearing on the motion to suppress was consistent with his amended statement. He testified that Sifuentes promised that he could make telephone calls from prison, that he could have a private contact visit with his wife, and that he would be transferred from the "hole." He explained that he had taken so long in coming forward with this information because he did not understand the seriousness of the allegations until they brought him to court, but that "[y]ou're talking about my life, you know."

Sifuentes testified at the hearing that he interviewed the appellant between approximately 11:30 a.m., and 1:50 p.m., on January 26, 2003. Before the interview started, Sifuentes read the appellant his rights. The appellant indicated that he understood his rights and signed a written waiver form. Sifuentes listened to what the appellant had to say, but did not write out his statement because the appellant wanted to do that himself. The appellant asked Sifuentes if his wife could come and see him, and Sifuentes told him that he didn't "see

---

13. *Green v. State,* 934 S.W.2d 92, 98 (Tex. Crim.App.1996).

14. *Id.*

15. *Id.*

16. This amended statement was admitted into evidence at the pre-trial hearing, but was not admitted at trial.

any problem" with that. Several times Sifuentes escorted the appellant to a nearby office where he could make telephone calls to his wife, but it took some time before the appellant's wife arrived at Hidalgo County Sheriff's Office. Sifuentes believed "she arrived after [the appellant] finished the statement." At that time, the appellant was allowed some time alone with his wife.

The prosecutor asked Sifuentes if he made any promises in exchange for the statement, and Sifuentes answered "No." The prosecutor specifically asked if he promised the appellant telephone calls or a private contact visit with his wife in exchange for his statement, and Sifuentes answered "No." Defense counsel asked Sifuentes if he promised that the appellant would be moved from "the hole" in exchange for giving the statement. Sifuentes answered "No, huh-uh. That's—that's detention, and we don't have anything to do with that."

In making its determination, the trial court chose to believe Sifuentes's testimony and to disbelieve the appellant's testimony. Because, the trial court's findings are supported by the record, they will not be disturbed on appeal. Point of error one is overruled.

## THE APPELLANT'S TATTOOS

 In his third point of error, the appellant argues that the trial court erred in requiring him to display his T.C.B. tattoos to the jury because this violated his Fifth Amendment right against self-incrimination. He argues that the State used the tattoos to bolster the testimony of their witness and to make the appellant out to be a "bad person because he is in a gang." However, the trial court did not

abuse its discretion by admitting this evidence because the tattoos were admissible to prove the "criminal street gang" element of the offense and their probative value was not outweighed by the danger of unfair prejudice. Also, requiring the appellant to display the tattoos did not violate the Fifth Amendment.[17] Point of error three is overruled.

## INEFFECTIVE ASSISTANCE OF COUNSEL

 In his second point of error, the appellant asserts that trial counsel rendered ineffective assistance because he failed to object to hearsay testimony that violated the Confrontation Clause. Specifically, he complains about counsel's failure to object to Sifuentes's testimony about information received from T.C.B. members who did not testify at trial.

In his fifth point of error, the appellant asserts that trial counsel rendered ineffective assistance because he failed to provide or offer any mitigating evidence during the punishment phase of the trial. The appellant contends that there were several witnesses available to provide mitigating evidence, but they were not called to testify. Also, he argues that trial counsel was supposed to provide mitigating evidence regarding his mental capacity during punishment but never did.

 To succeed on an ineffective-assistance claim, the defendant must show that: (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense.[18] To show deficient performance, the defendant must prove by a preponderance of the evidence that his counsel's representation fell below

17. *See Canales v. State,* 98 S.W.3d 690 (Tex. Crim.App.2003).

18. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

the standard of professional norms.[19] To demonstrate prejudice, the defendant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.[20]

Appellate review of trial counsel's representation is highly deferential and presumes that counsel's actions fell within the wide range of reasonable and professional assistance.[21] If counsel's reasons for his conduct do not appear in the record and there is at least the possibility that the conduct could have been grounded in legitimate trial strategy, we will defer to counsel's decisions and deny relief on an ineffective assistance claim on direct appeal.[22] Counsel's reasons for his actions or intentions do not appear in the record, and his conduct could have been part of a reasonable trial strategy. Without more, we must defer to counsel's decisions and deny relief. Points of error two and five are overruled.

## UNASSIGNED ERROR

Mindful of our inherent constitutional authority as a direct appeals court in capital death penalty cases to entertain unassigned error of a fundamental nature,[23] after original submission of the cause we ordered the parties to file supplemental briefs addressing two additional issues that concerned us following our prelimi-

nary review of the record.[24] Those briefs have been filed, and we turn next to a discussion of those issues. Both issues arise from the fact that the State secured a second death penalty for the offense of engaging in organized criminal activity under Section 71.02 of the Penal Code.[25] First, does Section 71.02 define organized criminal activity as an offense susceptible to capital punishment when the "offense" that the accused "commits" "as a member of a criminal street gang" is capital murder, which is one of the offenses enumerated in Subsection (1)(a)? Second, if so, does it violate the multiple-punishment prohibition of the Double Jeopardy Clause of the Fifth Amendment to assess the death penalty against him *both* for the capital murder itself *and* for committing capital murder as a member of a criminal street gang? After careful consideration, we hold that capital punishment *is not* available under these circumstances. However, we also conclude that it does *not* violate double jeopardy to try and to punish the appellant in a single proceeding for both the capital murder offense and the organized criminal activity offense.

### A. A Capital Felony?

According to Section 1.05(b) of the Texas Penal Code, certain sections of the Code Construction Act apply in construing its provisions.[26] Among those sec-

---

19. *Id.* at 688, 104 S.Ct. 2052.

20. *Id.* at 694, 104 S.Ct. 2052.

21. *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim.App.2002); *Chambers v. State*, 903 S.W.2d 21, 33 (Tex.Crim.App.1995).

22. *Ortiz v. State*, 93 S.W.3d 79, 88–89 (Tex. Crim.App.2002).

23. *Carter v. State*, 656 S.W.2d 468 (Tex.Crim. App.1983).

24. *See Pena v. State*, 191 S.W.3d 133 (Tex. Crim.App.2006) (in exercising authority to en-

tertain unassigned error, direct appeals court is obligated to remand to the parties for briefing under some circumstances, and in any event it may always do so at its discretion).

25. *See note 1, ante.*

26. TEX. PENAL CODE § 1.05(b) ("Unless a different construction is required by the context, Sections 311.011, 311.012, 311.014, 311.015, and 311.021 through 311.032 of Chapter 311, Government Code (Code Construction Act), apply to the construction of this code.")

tions of the Code Construction Act is Section 311.021(2),[27] which provides that "[i]n enacting a statute, it is presumed that ... the entire statute is intended to be effective[.]" We must presume that "in enacting a statute, the Legislature intends the entire statute to be effective[,]" and did not intend a useless thing.[28] The Legislature expressly included capital murder among the offenses that, if committed as a member of a criminal street gang, constitutes an offense under Section 71.02(a)(1) of the Penal Code. We cannot read those words out of the statute in keeping with the presumption of the Code Construction Act that some effect must be given to every word of a statute.

While it is thus clear that the statute makes a capital murder committed as a member of a criminal street gang an offense, far less clear from the face of the statute is how to classify that offense within the scheme identified in the Penal Code itself. Under the Penal Code, persons adjudged guilty of an offense are to be punished in accordance with the provisions of Chapter 12.[29] Offenses *added* to the Penal Code after its original promulgation, as Section 71.02 was,[30] are also to be classified for punishment purposes in accordance with Chapter 12.[31] Chapter 12 classifies felonies into five categories: capital felonies, felonies of the first, second, or third degree, and state-jail felonies.[32] At the time of the offense, a capital felony was punishable by life imprisonment or death.[33] There is no felony that is classified in Chapter 12 as higher than a capital felony.

Subsection (b) of Section 71.02 defines the classification of an offense committed under Subsection (a), at least for those instances in which the theory of the offense is that the defendant actually "committed" the underlying offense listed in Subsection (a)(1), rather than that he "conspired to commit" the underlying offense.[34] According to Subsection (b), the general rule is that when a defendant has committed the offense of organized criminal activity by actually committing one of the enumerated underlying offenses, the offense is classified "one category higher than the most serious offense" listed in subsection (a)(1) "that was committed." The exception to this general rule is "that if the most serious offense is a felony of the first degree, the offense is a felony of the first degree." Neither the general rule, however, nor the exception directly speaks to the classification that should apply for the commission of organized criminal activity in which a capital murder is committed. Capital murder is a capital felony, already the highest punishment classification under Chapter 12. Because there is no high-

---

27. Tex. Gov't Code § 311.021.

28. *Heckert v. State,* 612 S.W.2d 549, 552 (Tex. Crim.App.1981).

29. Tex. Pen.Code § 12.01(a).

30. The Texas Penal Code was enacted in 1973, effective January 1, 1974. *See* Acts 1973, 63rd Leg., ch. 399, p. 883, § 1, eff. Jan. 1, 1974. The offense of engaging in organized criminal activity was added as Title 11, Chapter 71, in 1977. *See* Acts 1977, 65th Leg., ch. 346, p. 922, § 1, eff. June 10, 1977.

31. Tex. Pen.Code § 12.01(b).

32. Tex. Pen.Code § 12.04.

33. Tex. Pen.Code § 12.31, prior to amendment in Acts 2005, 79th Leg., ch. 787, p. 2705, § 1, eff. Sept. 1, 2005. Under the 2005 amendment, the applicable range of punishment for a capital felony is life without parole or death.

34. For instances in which it is alleged and proven that the defendant "conspired to commit" the underlying offense, the punishment classification which the violation of Section 71.02 will fall under is determined by Subsection (c) of Section 71.02.

er category than "the most serious of-fense" actually committed, it is logically absurd to try to apply the plain and literal language of the general rule. And because capital murder is not a first-degree felony, the exception also does not expressly ap-ply.

In its supplemental brief, the State es-sentially concedes that the Legislature simply provided no range of punishment for the offense of capital murder commit-ted as a member of a criminal street gang. *See* State's Brief at 18–19. The State prays that we vacate the appellant's sec-ond death sentence and remand the cause to the trial court for alternative sentenc-ing. *Id.* at 39–41. Left unexplained in the State's brief is under what punishment category the trial court should sentence the appellant on remand under Section 71.02(b), if *not* the death penalty. This Court is not bound by the State's confes-sion of error, if that is what it is. *Saldano v. State,* 70 S.W.3d 873, 884 (Tex.Crim. App.2002). We hold that the appellant is punishable as a first-degree felon, and will remand for reassessment of punishment under that range.

We know that the Legislature intended that capital murder committed while a member of a criminal street gang should constitute an offense. But applying the plain language of Subsection (b) to classify that offense would lead to an absurd re-sult, since there is no category higher than a capital felony. We do not think it possi-ble that the Legislature intended such an absurdity; therefore, we must look beyond the plain language of the statute.[35]

One of the considerations that may in-form our construction of a code provision is its legislative history.[36] Chapter 71 of the Penal Code was originally enacted by the 65th Legislature in 1977.[37] It began as Senate Bill 151, which had its genesis in an interim report in 1976, before the legisla-tive session began. In this original Senate incarnation, the organized criminal activity statute would have made "criminal homi-cide" an underlying offense (which would have included capital murder). It would have classified every commission of the offense of organized criminal activity (in-cluding cases in which criminal homicide, including capital murder, was the underly-ing offense) as a first-degree felony, with-out exception. The bill was amended in the House, however, and in this amend-ment, "criminal homicide" was dropped as an underlying offense, and replaced with "murder." Moreover, the punishment pro-vision was modified to make a conviction for organized criminal activity "the same degree of felony or class of misdemeanor as" the underlying offense, again without exception. The Senate rejected the House amendment, and the bill was referred to a conference committee.

The version that was reported out of the conference committee was essentially the final version that was enacted. It express-ly added "capital murder" as an underlying offense, and changed the punishment pro-vision to an enhancement provision, mak-ing commission of organized criminal activ-ity punishable as one category higher than the underlying offense, with the exception that first-degree felonies would remain first-degree felonies. At no time during this process was there any indication that a conviction for organized criminal activity should carry a punishment range any high-er than a first-degree felony, even in cases in which capital murder is the underlying

---

**35.** *Boykin v. State,* 818 S.W.2d 782, 785 (Tex. Crim.App.*1991*).

**36.** Tex. Gov't Code § 311.023(3).

**37.** *See* Acts 1977, 65th Leg., p. 922, ch. 346, § 1, eff. June 10, 1977.

offense. This conclusion is bolstered by testimony at a conference committee hearing on May 25, 1977.[38]

Accordingly, we construe the exception contained in Section 71.02(b) to provide that a conviction for the offense of organized criminal activity in which the most serious underlying offense is *at least* a first-degree felony is punishable as a first-degree felony. Such a construction of the statute is consistent with our statutory principles of code construction. First and foremost, it gives effect to the Legislature's plain inclusion of capital murder as one of the underlying offenses supporting a conviction for organized criminal activity.[39] To read subsection (b) as simply providing no punishment category for the commission of capital murder as a member of a criminal street gang abrogates this legislative intent, which is an unacceptable "consequence[ ] of [that] particular construction[.]"[40] Moreover, our construction is consistent with the legislative intent, apparent from the statute's inception, and enduring through the amendatory process, that under no circumstances should a conviction for organized criminal activity carry any greater punishment than as a first-degree felony, regardless of the underlying offense. Finally, this construction achieves "a result feasible of execution"[41] —at least aside from whatever potential it may have to violate principles of double jeopardy. We turn next, then, to the question of whether it violates the Fifth Amendment protection against multiple punishments to assess separate punishments against the appellant in a single prosecution for both capital murder and capital murder as a member of a criminal street gang.

## B. Double Jeopardy Violation?

 In its supplemental brief, the State concedes that, as pled, proven, and charged to the jury, the capital murder and the offense of engaging in organized criminal activity by committing capital murder as a member of a criminal street gang are the "same offense" under a *Blockburger* analysis.[42] We agree. The first count of the indictment alleged the same theory of capital murder of the same victims on the same day and place, and by the same manner and means, as the capital murder alleged in the fourth count. The only additional element added to the fourth count was that the appellant committed that same capital murder "as a member of a criminal street gang." Thus, the two offenses are clearly the "same" under any reading of *Blockburger*.[43] However, in the context of multiple punishments arising from a single prosecution, we agree with the State that this does not end the jeopardy analysis.

 In the multiple punishment context:

[T]he *Blockburger* test is no more than a rule of statutory construction, useful in discerning the legislative intent as to scope of punishment where the intent is not otherwise manifested. The *Blockburger* test does not operate, however,

---

38. *See Hearings on Tex. S.B. 151 Before the Conference Committee on Crime*, 65th Leg., R.S. (May 25, 1977), *available at* http:www.tsl.state.tx.us/ref/senatetapes/65/index.htm# conf.

39. Tex. Gov't Code § 311.021(2).

40. Tex. Gov't Code § 311.023(5).

41. Tex. Gov't Code § 311.021(4).

42. *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932).

43. *See Parrish v. State*, 869 S.W.2d 352, 354 (Tex.Crim.App.1994).

to trump "clearly expressed legislative intent."[44]

The State argues that the Legislature had clearly indicated its intention that defendants be susceptible to punishment both for organized criminal activity and for any underlying offense they may commit. Again, we agree.

Section 71.03(3) of the Penal Code provides that "[i]t is no defense to prosecution under Section 71.02 that ... a person has been charged with, acquitted, or convicted of any offense listed in Subsection (a) of Section 71.02[.]" Several courts of appeals have construed this provision as a clear legislative expression of an intent that defendants charged with both engaging in organized criminal activity and commission of the underlying offense be punished for both, notwithstanding their "sameness."[45] We express no opinion whether this provision may operate constitutionally to authorize multiple *prosecutions* for the same offense as determined by a *Blockburger* analysis, since that question is not before us in this particular case.[46] But in the context of multiple *punishments* deriving from a single prosecution, we do not hesitate to agree with the courts of appeals that the Legislature has indicated with sufficient clarity its intention that a defendant charged with engaging in organized criminal activity may also be charged (at least in the same proceeding) with the underlying offense and punished for both.

We therefore conclude that the trial court did not err to instruct the jury that it could convict the appellant for both the offense of capital murder and the separate offense of engaging in organized criminal activity by committing capital murder as a member of a criminal street gang and that it could punish the appellant for both. However, the trial court did err to sentence the appellant to death for the latter. Accordingly, we affirm the appellant's conviction and sentence of death for capital murder under Section 19.03 of the Penal Code, but we vacate his sentence of death for organized criminal activity under Section 71.02 of the Penal Code,[47] and remand the latter cause to the trial court for re-sentencing as a first-degree felony in accordance with this opinion.[48]

WOMACK, J., dissented.

---

44. *Ex parte Kopecky,* 821 S.W.2d 957, 959 (Tex.Crim.App.1992), *quoting Missouri v. Hunter,* 459 U.S. 359, 368, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983).

45. *Crumpton v. State,* 977 S.W.2d 763, 770 (Tex.App.-Fort Worth 1998, no pet.); *Reina v. State,* 940 S.W.2d 770, 775–76 (Tex.App.-Austin 1997, pet. ref'd).

46. *See, e.g., Lam v. State,* 17 S.W.3d 381, 384–85 (Tex.App.-Houston [1st Dist.] 2000, pet. ref'd); *McGee v. State,* 909 S.W.2d 516, 519 (Tex.App.-Tyler 1995, pet. ref'd).

47. The trial court entered separate judgments for the capital murder conviction and the organized criminal activity conviction. Each judgment reflects the same cause number (CR–0945–03–I) but a different Texas Registration Number (TRN 904 007 9706 A001 for the capital murder conviction and TRN 904 007 9706 A004 for the engaging in organized criminal activity conviction). We have assigned separate cause numbers in this Court for the two convictions. The capital murder conviction carries our cause number AP–74,-935. The conviction for organized criminal activity carries our cause number AP–75,597. In AP–74,935, we affirm the conviction and death sentence for capital murder. In AP–75,597, we affirm the conviction for engaging in organized criminal activity, but vacate the death sentence and remand the cause to the trial court for re-sentencing as a first-degree felony.

48. *See* Tex.Code Crim. Proc. art. 44.29(b).