Court of Appeals
Fourth Court of Appeals District of Texas
San Antonio


# MEMORANDUM OPINION

No. 04-09-00260-CR

Jose Valdez **LARA**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 81st Judicial District Court, Atascosa County, Texas
Trial Court No. 07-12-0355-CRA
Honorable Donna S. Rayes, Judge Presiding

Opinion by:   Marialyn Barnard, Justice

Sitting:   Sandee Bryan Marion, Justice
Phylis J. Speedlin, Justice
Marialyn Barnard, Justice

Delivered and Filed:   August 18, 2010

AFFIRMED

Following a jury trial, appellant Jose Valdez Lara was convicted of murder.  The jury assessed punishment at confinement in the Texas Department of Criminal Justice–Institutional Division for ninety-nine years.  The trial court entered a judgment in accordance with the jury's verdicts.  On appeal, Lara contends: (1) the trial court erred in denying his motion for mistrial; (2) the trial court erred and violated his rights under the United States Constitution and the Texas Constitution by allowing into evidence a report from the Bexar County Criminal Investigation

Laboratory; and (3) he received ineffective assistance of counsel. We affirm the trial court's judgment.

## BACKGROUND

The record shows that on the morning of July 21, 2007, Lara drove a silver Mustang to his father's house in Atascosa County, Texas. The house was located on a five-acre tract of land, but the entire property consisted of fifty-five acres. The house was occupied by Lara's father, Joe Lara, and his half-brother, Joel Lara. Joel testified that on the morning of July 21st, he was sleeping after a night of "partying." Around 8:00 a.m., Joel stated his father told him there was a gray car outside the house, but Joel said he "was already all partied out so [he] just stayed asleep." Later, he heard someone coming up the steps of the house. He ignored the sound, but admitted seeing Lara in the doorway. Joel said he went back to sleep and did not wake up until around 11:00 a.m. When he woke up, he noticed the door was open and asked his father to close it. Receiving no response, Joel got up and went to the restroom where he looked out the window and saw his father lying on the ground next to the trash can. Joel stated he ran downstairs to his father, but he was dead. Joel saw bullet holes in his father's chest, and shell casings around the body. Joel opined that he did not hear the gunshots because he was hung over and the air conditioning unit is loud.

After grabbing his phone, Joel got into his father's truck and called his sister. Joel admitted he did not call police immediately because he believed Lara had shot his father, and intended to take matters into his own hands. This was also his explanation for his initial failure to tell police that he had seen Lara at the house the morning of the shooting. Eventually, however, while Joel was driving he ran into a neighbor, and after they both pulled over, Joel

called the police. Joel then went to meet his sister, and they went back to the house. The police were there when they got back to the house.

During the investigation, police learned that two neighbors heard several gunshots on the morning of the murder. Arturo Alvarado, who lived approximately one-half mile from the house occupied by Joe and Joel Lara, testified he heard gunshots around 5:30 a.m. or 6:00 a.m. When Alvarado heard the shots he looked out his window, and although he could not really see anything, he stated the gunshots definitely came from the direction of the Lara home. It was only later, when he heard about the murder on the news, that he connected the gunshots to the murder. Alvarado also testified that the evening before the shooting he saw a silver Mustang drive by his house, and he did not recognize the car as belonging to any of his neighbors. Alvarado said he also saw a silver car the next morning around the time of the shooting, but he could not be sure it was the same car.

Another neighbor, Corina Ambriz, testified that on the morning of July 21st she was awakened by six or seven "loud bangs." Initially, she believed it was her boyfriend hammering outside, but when she went to look for him he had already left. Ambriz testified it was about 6:40 a.m. when she heard the loud bangs, and that the noise came from the direction of the Lara house.

Several witnesses testified they saw Lara driving a gray Mustang after the murder. Lara's roommate and boyfriend, Arnulfo C. Ybarra Jr., admitted that on the evening before the murder Lara dropped Ybarra off at work at about 10:15 p.m. Lara was driving Ybarra's silver Mustang. Lara was supposed to pick Ybarra up the next morning, the day of the murder, but never arrived despite Ybarra's numerous calls to him. Ybarra, who was a park police officer, got a ride home with another officer and arrived at the apartment around 7:30 a.m. or 7:45 a.m.; Lara

was not home. Ybarra continued to try and contact Lara, and even called several relatives, but no one had seen Lara. Ybarra went to bed, but was awakened by a phone call from Lara at approximately 11:30 a.m. The first thing Lara said to Ybarra was "I just killed my dad." Ybarra asked him if he was alright, and Lara said everything was okay and hung up.

Ybarra admitted to having two guns: one was a 40-caliber Glock Model 22, which he was issued in his role as a park police officer, and the other was a 40-caliber Glock Model 23, which was his own personal weapon. Ybarra testified that each weapon was capable of firing the same ammunition, and he kept spare ammunition in the apartment. After Lara admitted killing his father, Ybarra looked for his personal weapon and discovered it was missing. According to Ybarra, Lara admitted taking the weapon and using it to kill his father. Ybarra reported the weapon missing, and it has never been found.

The day after the murder, Lara returned to the apartment he shared with Ybarra. Accompanying Lara were his sister, Mary Jo Rodriguez, and a small child she was babysitting. Ybarra testified that when Lara came into the apartment he "broke down," and again stated he had killed his father. Ybarra said Lara began to cry, and then told him what happened. According to Ybarra, Lara said that the night before the murder someone tried to enter his apartment and kill him. Lara told Ybarra that he found out the person that wanted him dead was his father, Joe Lara. Lara claimed his father wanted Ybarra killed as well. Lara said he went to his father's house to confront him, and the two had a "heated conversation," and when Joe Lara "pulled out a weapon," Lara drew the weapon he had taken from Ybarra and began shooting. Lara said he believed he shot his father fourteen times. The medical examiner ultimately determined Joe Lara was shot nine times. Lara also told Ybarra that after the shooting he went into the doorway of the house and saw Joel was asleep, confirming Joel's account that he saw

Lara at the house around the time of the murder. Lara claimed he had disposed of the weapon he used to murder his father as well as the gloves and clothing he was wearing.

According to Ybarra, he told Lara to take a shower and try to get some rest, which he did. A few hours later, Ybarra and Lara took Rodriguez and the child to Uvalde. Thereafter, Lara and Ybarra went to Garner State Park and drove around for several hours. After that, the two went to the home of Lara's grandfather where Lara spoke briefly with his grandfather and an uncle about the murder. Ybarra claimed Lara was calm, acting as if nothing had happened. Finally, the two returned to their apartment in San Antonio and resumed their normal activities, which lasted until September 9, 2007. On that date, Ybarra said Lara took the silver Mustang and disappeared. Lara later told Ybarra he had been kidnapped and beaten, but after three or four days he managed to escape. Ybarra did not see Lara until October 5, 2007, when he went to meet Lara in San Angelo in response to a call from Lara. Ybarra left after three or four days because he had to return to work. After he returned, he was informed by his chief that Lara had been arrested. Ybarra was ultimately questioned by law enforcement and later indicted for tampering with evidence and attempting to tamper with evidence. He pled guilty to those charges and lost his job.

Lara's sister, Mary Jo Rodriguez, also testified. She stated that on the day her father was murdered, she was at her mother-in-law's house in Uvalde.[1] Lara called her and asked if she could "get him some drugs." Rodriguez had a previous conviction for possession of a controlled substance with intent to distribute. Rodriguez told Lara she could not. Later, Ybarra called Rodriguez and told her Lara had disappeared and begged her to find him. Somehow Rodriguez learned Lara was going to be in Del Rio so she went to Del Rio to find him. Rodriguez said that

---

[1]Rodriguez was Joe Lara's adopted daughter. Rodriguez's mother married Joe Lara while she was pregnant with Rodriguez, and he signed the birth certificate and ultimately adopted her. Rodriguez rarely saw Lara after he and her mother divorced.

when she found Lara in Del Rio he was driving a gray Mustang. She testified she got into the car with Lara and they drove back to Uvalde.

During the drive, Rodriguez said she told Lara there was a rumor going around Uvalde that Joe Lara was dead. After Rodriguez told Lara about the rumor, Lara calmly said, "I know because I killed him." Rodriguez testified this made her physically sick, and they had to pull the car over at a rest area. Lara told her he killed their father because their father wanted to kill him, and had actually sent someone over to the apartment he shared with Ybarra to do it, but Lara had overpowered the hit man. It was the hit man that told Lara he was hired by Joe Lara to kill Lara and Ybarra. According to Lara, his father paid the hit man $5,000.00. Just as he told Ybarra, Lara told Rodriguez that he went to confront his father. When he got there, his father called him a "son of a bitch" and pulled out a gun. Lara claimed he was able to draw his weapon and shoot before his father could. Rodriguez never contacted law enforcement, and only gave a statement to police when they showed up at one of her parole meetings.

Police ultimately discovered Ybarra's Mustang, a bullet proof vest that belonged to Ybarra, and a replica police badge that Ybarra had given to Lara in the possession of Suzanne Salazar. Salazar met Lara in September of 2007 near San Angelo. According to Salazar, she and Lara began a romantic relationship, and Lara told her he was a park police officer who was investigating the murder of his father. Lara said he had taken a leave of absence from his official duties to conduct the investigation. Lara told Salazar that he believed a drug cartel had murdered his father. Before he left, Lara gave Salazar the vest and the badge. He also left the Mustang with Salazar, and later Ybarra asked her to "hide it, put a tarp over it, chop it up, get rid of it, whatever" because it could incriminate Lara. Salazar testified she became suspicious and called the San Angelo police, who came and picked up the vest, the replica badge, and the Mustang.

Lara was ultimately arrested and charged with murder. Lara asserted self-defense. Rejecting Lara's claim of self-defense, the jury found Lara guilty. The jury also rejected Lara's claim of sudden passion, which he asserted during the punishment phase and assessed punishment at ninety-nine years confinement.

## MISTRIAL

Lara first contends the trial court erred in denying his motion for mistrial. Lara argues the trial court should have granted his motion for mistrial when his sister, Rodriguez, testified about matters that were the subject of one of his motions in limine in which he asked the trial court to preclude any mention of Lara's prior imprisonment or criminal offenses. The motion in limine was granted by the trial court.

An appellate court reviews a trial court's decision to deny a mistrial for an abuse of discretion. *Berkley v. State*, 298 S.W.3d 712, 714 (Tex. App.—San Antonio 2009, pet. ref'd) (citing *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004)). "A mistrial is a remedy of last resort." *Berkley*, 298 S.W.3d at 714. "Only in extreme circumstances, where the prejudice is incurable, will a mistrial be required." *Id.* (quoting *Hawkins*, 135 S.W.3d at 77). An instruction to disregard any improper testimony or comment is generally sufficient to cure any error. *See Berkley*, 298 S.W.3d at 714.

During Lara's cross examination of Rodriguez, the following exchange occurred:

[Lara's Attorney]: What is this business about "dad sent someone to kill me last night." Who?

[Rodriguez]: I don't know who.

[Lara's Attorney]: Is it believable?

[Rodriguez]: Well, when [Lara] was in prison there were several attempts on his life.

\*     \*     \*

[The State]: Your Honor, may we approach, please.

[The Court]: Yes.

(At the bench off the record)

[The Court]: All right, ladies and gentlemen, we're going to let you have another little break. And please return to the jury room at 3:35.

(Jury out)

[The Court]: Let the record reflect that we're outside the presence [of] the jury. Ms. Rodriguez, I need to admonish you as I know [State's counsel] already has that there has been a ruling by the Court that there is to be no mention of any prior imprisonment or prior criminal offenses of . . . the defendant in this case until the attorneys have had an opportunity to approach the bench and have a ruling on whether or not that would be admissible . . . [s]o do not mention that again. You understand?

[Rodriguez]: Yes, ma'am.

[Lara's Attorney]: I still think I need a rule for mistrial, Judge. I don't think an instruction to the jury – I think if you instruct them it will just draw further attention to the jury's minds about . . . Mr. Lara's imprisonment and I don't think an instruction can cure it or do anything to help do anything but hurt. I'm confident the witness was admonished before she took the stand. I'm not suggesting anything but I think we're in an area that should result in mistrial and move for such.

[The Court]: Denied.

First, it could be argued Lara has waived any error with regard to Rodriguez's testimony. It was counsel for the State, not Lara, that asked to approach and reminded the trial court that its earlier ruling on Lara's motion in limine precluded mention of any prior imprisonment or criminal offenses by Lara before that issue was brought to the trial court's attention outside the presence of the jury. To preserve an issue for appellate review, the complaining party must have made a timely request, objection, or motion to the trial court. TEX. R. APP. P. 33.1. Moreover, the granting of a motion in limine preserves nothing for appellate review. *Geuder v. State*, 115

S.W.3d 11, 14-15 (Tex. Crim. App. 2003). Rather, it is necessary for the proponent of a motion in limine to object when the subject matter of the motion is raised during trial. *Id.* at 15 n.11. It was the State, not Lara that brought the matter to the trial court's attention. It was only after the State brought it up that Lara moved for mistrial. However, even if the error were not waived based on Lara's failure to bring the matter to the court's attention, he would still not be entitled to relief.

An instruction to disregard any improper testimony is generally sufficient to cure any error. *See Berkley*, 298 S.W.3d at 714. Specifically, testimony referring to or implying other criminal offenses may be rendered harmless by an instruction to disregard. *Campos v. State*, 589 S.W.2d 424, 428 (Tex. Crim. App. 1979). Here, however, Lara's counsel told the trial court it was his belief that any instruction would serve only to draw further attention to the matter. Thus, it was Lara that precluded a curative instruction, which would have cured any error resulting from Rodriguez's testimony. *See id.* Moreover, a mistrial is required only when the evidence is "clearly calculated to inflame the minds of the jury and is of such character as to suggest the impossibility of withdrawing the impression produced on their minds." *Id.* We find nothing in the record to suggest Rodriguez made her statement despite the admonishment from the State in an effort to inflame the jury. Rather, it is obvious that she was attempting to answer the question asked by Lara's attorney. Accordingly, we hold the trial court did not abuse its discretion in denying Lara's motion for mistrial, and we overrule his first issue.

### CONFRONTATION CLAUSE VIOLATION

Lara next claims his rights under the Sixth Amendment of the United States Constitution and Article I, section 10 of the Texas Constitution were violated when the trial court admitted into evidence a ballistics report from the Bexar County Crime Investigation Laboratory. Lara

argues the admission was improper because the firearms expert who prepared the report, Dale Justice, was unavailable for trial, and Lara was prevented from confronting Justice.

When the State attempted to introduce the ballistics report, Lara's counsel asked to approach the bench. The jury was excused, and outside its presence Lara's counsel objected to the report, stating:

> I've not seen this document before. I'm unaware until now what this gentleman is going to testify about. We had a pretty extensive discovery hearing. One of the points in that hearing was to consecutively number the documents that are given to defense counsel and I believe that discovery request was granted. And I believe when we had a discovery hearing, Judge – I haven't seen this document and I object to the document being admitted into evidence and I object to the gentleman's testimony because this is a surprise to me.

The State responded by informing the trial court that the report was in the State's file before it was reviewed by Lara's counsel, and was available to him at all times. The State also argued that Lara's counsel was aware of the report and that a witness other than Dale Justice would be testifying about ballistics because the information was on the State's second amended witness list. Lara's counsel admitted he had gone through the State's file, but stated he never saw the ballistics report. After considering the arguments, the trial court asked Lara's attorney if he had "any other grounds" for his objection; Lara's counsel said, "No, ma'am."

It is clear from the foregoing that Lara did not raise a Sixth Amendment, an article I, section 10, or a confrontation clause objection, but merely objected on the ground that the State failed to produce the ballistics report during discovery; this is apparent from the record. *See* TEX. R. APP. P. 33.1(a). Even constitutional errors, including those arising under the Sixth Amendment or article I, section 10 may be waived if they are not asserted at trial. *See Paredes v. State*, 129 S.W.3d 530, 535 (Tex. Crim. App. 2004) (holding hearsay objection failed to preserve error on Sixth Amendment grounds); *Wright v. State*, 28 S.W.3d 526, 536 (Tex. Crim. App.

2000) (holding Sixth Amendment complaint waived for failure to object on that basis at trial.). In this case, Lara failed to raise any confrontation clause complaint, and has therefore waived such complaint. *See id.*; *see also Guevara v. State*, 97 S.W.3d 579, 583 (Tex. Crim. App. 2003) (holding to preserve error for appellate review, complaint on appeal must comport with trial objection); *Broxton v. State*, 909 S.W.2d 912, 918 (Tex. Crim. App. 1995) (same). We therefore overrule Lara's second issue.

### INEFFECTIVE ASSISTANCE OF COUNSEL

In his remaining issues, Lara contends he received ineffective assistance of counsel. To prevail on his ineffective assistance of counsel claim, Lara must show: (1) his trial counsel's performance was deficient, and (2) the deficient performance prejudiced his defense. *See Strickland v. Washington*, 466 U.S. 668, 688 (1984); *Garza v. State*, 213 S.W.3d 338, 347 (Tex. Crim. App. 2007). To establish counsel's performance was deficient, Lara must prove by a preponderance of the evidence that his counsel's representation fell below an objective standard of professional norms. *See Strickland*, 466 U.S. at 688; *Garza*, 213 S.W.3d at 347-48. To establish his defense was prejudiced, Lara must show there is a reasonable probability that but for trial counsel's errors, the outcome of the trial would have been different. *Mitchell v. State*, 68 S.W.3d 640, 642 (Tex. Crim. App. 2002); *Ruiz v. State*, 293 S.W.3d 685, 690 (Tex. App.—San Antonio 2009, pet. ref'd). A "reasonable probability" is a probability that undermines confidence in the outcome of the proceeding. *Strickland*, 466 U.S. at 694.

We must presume trial counsel provided effective assistance, *see Mallett v. State*, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001), and to overcome this presumption, Lara must establish that his claim of ineffectiveness is firmly founded in the record, and the record affirmatively demonstrates the alleged ineffectiveness. *See Thompson v. State*, 9 S.W.3d 808, 813-24 (Tex.

Crim. App. 1999). There is a strong presumption that trial counsel's decisions and actions were motivated by sound trial strategy. *Salinas v. State*, 163 S.W.3d 734, 740 (Tex. Crim. App. 2005). "When the record is silent as to counsel's strategy, a reviewing court cannot speculate that counsel's performance was deficient." *Ruiz*, 293 S.W.3d at 690-91. Rather, if the record is silent as to the reasons behind counsel's decisions or actions, the presumption of effectiveness is sufficient to deny relief. *Id*. (citing *Rylander v. State*, 101 S.W.3d 107, 110-11 (Tex. Crim. App. 2003)). Trial counsel's performance will be deemed sufficient if any strategy can be ascribed to his actions or decisions, and his performance will be found deficient only if "the conduct was so outrageous that no competent attorney would have engaged in it." *Andrews v. State*, 159 S.W.3d 98, 101 (Tex. Crim. App. 2005). A defendant is not entitled to "'errorless or perfect counsel.'" *Ruiz*, 293 S.W.3d at 691 (quoting *Ex parte Welborn*, 785 S.W.2d 391, 393 (Tex. Crim. App. 1990)).

Lara first contends his trial counsel was ineffective because he failed to ask for a limiting instruction when his sister, Rodriguez, stated there were several attempts on Lara's life "when he was in prison." As we discussed in our review of Lara's first issue, trial counsel did not ask for a limiting instruction, rather he simply moved for a mistrial. However, on the record, counsel explained his strategy for declining a limiting instruction:

> I still think I need a rule for mistrial, Judge. I don't think an instruction to the jury – I think if you instruct them it will just draw further attention to the jury's minds about . . . Mr. Lara's imprisonment and I don't think an instruction can cure it or do anything to help do anything but hurt. I'm confident the witness was admonished before she took the stand.

Unlike most cases in which a claim of ineffective assistance of counsel is raised, trial counsel fully explained his reasons for refusing to take the action Lara now complains of. We find counsel's strategy was not outside objective professional norms, *see Garza*, 213 S.W.3d at 347-

48, and was not so outrageous that no competent attorney would have made the same decision. *See Andrews*, 159 S.W.3d at 101. Accordingly, we hold Lara has failed to establish trial counsel's performance was deficient, and overrule his third issue. *See Strickland*, 466 U.S. at 688; *Garza*, 213 S.W.3d at 347.

In issue four, Lara complains his trial counsel was ineffective with regard to the evidence relevant to the weapon used to kill Joe Lara. Lara argues, based on his counsel's admission that he never saw the ballistics report in the State's file, that counsel failed to adequately prepare to meet this evidence or the testimony of the report's sponsoring witness, Edward Charles Wallace. Lara contends in issue five that his counsel was ineffective with regard to this same evidence for failing to object to the report on the ground that its admission violated his rights under the federal and state confrontation clauses.

We hold that even if counsel was ineffective for failing to know of, and prepare for, the ballistics evidence, Lara has failed to establish his defense suffered any prejudice as a result of counsel's alleged failures, i.e., that there is a reasonable probability that but for the alleged error, the outcome of the trial would have been different. *See Mitchell*, 68 S.W.3d at 642; *Ruiz*, 293 S.W.3d at 690. Numerous witnesses, including Ybarra and Rodriguez, testified Lara admitted killing his father, but stated Lara claimed he did so only because his father wanted him dead and pulled a gun on him first. A review of the record shows Lara's defensive theory was that he acted in self-defense. That was the entire basis of Lara's questions to witnesses as well as his closing argument–he killed his father only because he believed his father was about to kill him. Lara requested and received a jury charge on self-defense. Given that Lara's defensive theory was that he killed his father, but in self defense, whether he killed him with a gun taken from Ybarra or some other gun is wholly irrelevant. The self defense theory eliminated any probative

value relating to ballistics. Thus, we hold counsel's alleged lack of investigation and preparation with regard to ballistics did not contribute to the jury's verdict of guilt. Lara has therefore failed to establish prejudice to his defense. *See Strickland*, 466 U.S. at 688; *Garza*, 213 S.W.3d at 347.

This same reasoning applies to Lara's claim that his counsel was ineffective for failing to object to the ballistics report and testimony relating thereto on confrontation clause grounds. Lara's self defense theory negated the relevance of the ballistics evidence. Accordingly, Lara's ineffective assistance of counsel issues, as they relate to the ballistics evidence, are overruled.

## CONCLUSION

We overrule Lara's issues and affirm the trial court's judgment.

Marialyn Barnard, Justice

Do Not Publish