Court Of Appeals
Fourth Court of Appeals District of Texas
San Antonio





# MEMORANDUM OPINION

No. 04-09-00070-CR

John W. **PRATT**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 379th Judicial District Court, Bexar County, Texas
Trial Court No. 2006-CR-4433
Honorable Robert Barton, Judge Presiding[1]

Opinion by:    Catherine Stone, Chief Justice

Sitting:       Catherine Stone, Chief Justice
             Karen Angelini, Justice
             Marialyn Barnard, Justice

Delivered and Filed: February 17, 2010

AFFIRMED

      John W. Pratt was convicted by a jury of two counts of aggravated sexual assault and two counts of indecency with a child. The jury assessed the maximum sentence of life imprisonment for each of the aggravated sexual assault counts and twenty years imprisonment for each of the indecency with a child counts. On appeal, Pratt challenges the sufficiency of the evidence to support

---

[1] The Honorable Robert Barton presided over the trial and pronounced the sentences. The Honorable Ron Rangel presided over the hearing on the motion for new trial and signed the order denying the motion.

the jury's verdict and contends that his trial counsel failed to provide effective assistance of counsel. We affirm the trial court's judgments.

### SUFFICIENCY OF THE EVIDENCE

In determining the legal sufficiency of the evidence, we review all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Vodochodsky v. State*, 158 S.W.3d 502, 509 (Tex. Crim. App. 2005). In conducting a factual sufficiency review, we view all of the evidence in a neutral light and set aside the verdict only if: (1) the evidence is so weak that the verdict is clearly wrong and manifestly unjust; or (2) the verdict is against the great weight and preponderance of the evidence. *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000). "[D]ue deference must be accorded the fact finder's determinations, particularly those determinations concerning the weight and credibility of the evidence," and a reviewing court's disagreement "with the fact finder's determination is appropriate only when the record clearly indicates such a step is necessary to arrest the occurrence of a manifest injustice." *Id.* at 9.

A person commits an offense of aggravated sexual assault if the person intentionally or knowingly causes the penetration of the sexual organ of a child by any means. TEX. PEN. CODE ANN. § 22.021(a)(1)(B)(i) (Vernon Supp. 2009). The jury found Pratt guilty of committing two counts of aggravated sexual assault by intentionally or knowingly penetrating the sexual organ of A.B. with his finger on or about two different dates.

A person commits an offense of indecency with a child by engaging in sexual contact with a child. TEX. PEN. CODE ANN. § 21.11(a)(1) (Vernon Supp. 2009). "Sexual contact" is defined to include any touching by a person of any part of the genitals of a child with the intent to arouse or

gratify the sexual desire of any person. *Id*. at § 21.11(c)(1). The jury found Pratt guilty of committing two counts of indecency with a child by touching the genitals of L.B. on or about two different dates.

In 2004, A.B. and L.B., who are twin sisters, attended a five-day overnight church retreat. Dominic Valerio, a youth minister, testified that A.B. approached him toward the end of the retreat, and she was very distraught and nervous. Valerio began questioning A.B. regarding her problem. Valerio testified that A.B.'s behavior was "typical of other children who have been sexually abused." After A.B. admitted that she had been sexually abused by her step-grandfather, she started "shutting down" because she was nervous and embarrassed. Although L.B. also was at the camp, she did not approach Valerio. Valerio testified that as trial approached, A.B. became very distraught to the point of self-mutilation by cutting herself, experimenting with drugs, and attempting suicide. Valerio later learned the abuse occurred at a home in San Antonio when L.B. and A.B. were around four or five years old.

On cross-examination, Valerio testified that he did not recall telling the police that the incident happened about five years before 2005. Valerio also did not recall that he told the police the incidents happened over and over again and in different places. Valerio later clarified that the different places referred to San Antonio and Austin.

A.B. was nineteen years old at the time of trial in 2008. A.B. testified that Pratt, her step-grandfather, sexually abused her when she was living with him and her grandmother, Laura Pratt. A.B. stated she was around four or five at the time. A.B. testified that the abuse occurred in the bedroom usually late at night almost every night. L.B. was in the room when the abuse occurred. A.B. stated that Pratt touched her inside her vagina with his hands and put his penis inside of her

mouth. A.B. also saw Pratt touching L.B. A.B. first told her youth minister about the abuse three or four years before trial because she wanted freedom from keeping a secret. A.B. stated that it was difficult for her to talk about the incident and she had become very depressed and tried to commit suicide a few months before trial.

On cross-examination, A.B. admitted it was difficult to remember things from when she was four or five. A.B. stated that her dad's bedroom was next to hers, and the Pratts had a dog that would "sometimes" sleep at the foot of her bed. A.B. did not remember if the door to the bedroom was open or closed at night and did not remember having nightmares when she moved in with the Pratts. A.B. stated that the abuse occurred only in San Antonio, not in Austin. A.B. stated that she visited and took trips with the Pratts after she moved to Austin with her dad, but Pratt never abused her on those occasions. A.B. believed she was sixteen when she told the youth minister about the sexual abuse. A.B. stated that she did not tell the youth minister that the abuse occurred five years before 2005.

L.B. testified that her step-grandfather sexually abused A.B. and her when they were around four or five years old. L.B. testified that he would come into their bedroom while they were sleeping. L.B. remembered Pratt sticking his hand in her panties and rubbing his hand on her vagina. L.B. stated that the abuse happened a lot but not every single night. L.B. thought the abuse was just occurring to her, and she never talked to A.B. about it. L.B. would pretend to be asleep when the abuse occurred. L.B. did not act differently toward Pratt because she did not know the touching was wrong. L.B. testified that A.B. had been really depressed, was cutting herself, and tried to commit suicide. L.B. believed A.B. had a harder time coping than her because A.B. remembered a lot worse things than L.B. did.

On cross-examination, L.B. admitted A.B. told L.B. that their step-grandfather did something to her before L.B. said anything to her dad and stepmother. L.B. believed they lived with the Pratts for about a year when they were four or five. L.B. remembered waking up sometimes and going to sleep with her grandmother.

Michael B., A.B. and L.B.'s father, testified that he moved to Austin after living with the Pratts for a year. Michael B. testified that he decided to move when he walked in on Pratt yelling and screaming at A.B. and L.B. like they were dogs. Michael B. testified that the Pratts drank every day, but he never saw Pratt intoxicated. Michael B. heard of the abuse from his church pastor three years prior to trial. Michael B. recalled that A.B. would throw a fit and start crying when he would send A.B. and L.B. to stay with the Pratts after moving to Austin.

On cross-examination, Michael B. testified that he was home by around 10:00 each night while they were living with the Pratts. Michael B.'s bedroom was next to the bedroom where A.B. and L.B. slept while they lived with the Pratts. Michael B. testified that the bedroom doors were open at night. Michael B. testified that the Pratts' dog would sleep in A.B. and L.B.'s room sometimes. Michael B. did not recall A.B. and L.B. having nightmares while living at the Pratts. Michael B. stated that A.B. and L.B. would spend some weekends with the Pratts and took trips with them after they moved to Austin. Michael B. stated that the relationship between his mother and his second wife deteriorated after his mother accused one of his wife's sons of acting sexually inappropriate toward A.B. and L.B. His mother made the allegation before A.B. told the youth minister about Pratt's abuse.

Vicki B., A.B. and L.B.'s stepmother, first learned of the sexual abuse when Valerio informed her about what A.B. had told him. Vicki B. learned that L.B. also had been abused when

she asked her. Vicki B. stated that Laura Pratt accused one of her sons of inappropriately touching A.B. and L.B., but A.B. and L.B. denied that any such touching had occurred. Vicki B. stated that Laura Pratt made the allegation about her son about five years after the girls moved out of the Pratts' house, which was several years before A.B. told the youth minster about the sexual abuse by Pratt.

On cross-examination, Vicki B. did not recall a discussion with Laura Pratt regarding an incident in which Vicki B.'s son and A.B. locked themselves in a bedroom, and L.B. was crying because she could not get in the room. Vicki B. did not believe A.B. and L.B. had discussed the sexual abuse before she asked L.B. about it.

Betty Mercer, a sexual assault nurse examiner, testified that some abuse victims do not reveal the abuse for days, months, or even years. Mercer further stated that a five-year-old could believe sexual abuse to be normal behavior. Mercer examined A.B. in October of 2005. Mercer testified that A.B. reported that her grandfather molested her when she was six years old by sticking his finger up her vagina while she was in her bed trying to sleep. A.B. reported that the abuse happened about three times. A.B. reported the abuse happened nine years ago. With regard to Mercer's examination of L.B., L.B. reported that her grandfather stuck his hand in her pants when she was five or six. The abuse occurred at night while she was trying to sleep. L.B. rubbed her hand on her knee to demonstrate how her grandfather touched her.

On cross-examination, Mercer agreed that A.B. did not report her grandfather having put his penis in her mouth. Mercer further agreed that A.B. reported the abuse happened only three times.

Both Laura Pratt, A.B. and L.B.'s grandmother, and Pratt testified that A.B., L.B., and Michael B. moved in with them in May of 1993. A.B. and L.B. were four years old at the time. Laura put A.B. and L.B. to sleep every night and left their door open. Laura recalled both A.B. and

L.B. frequently waking up at night and crying. Laura said neither A.B. nor L.B. would sleep with her, but Laura would go into their room to comfort them. Laura testified that she sleeps only a few hours, and she would know if Pratt got up in the middle of the night. Laura stated that her dog, which slept in the room with A.B. and L.B., would yap if anyone entered A.B. and L.B.'s room. Two other defense witnesses, Pratt's niece, Deborah Thompson, and her daughter Stacey Thompson also testified that the Pratts' dog slept in the room with A.B. and L.B.

After A.B. and L.B. moved to Austin with Michael B., A.B. and L.B. would spend weekends with the Pratts and go on trips with them. Laura recalled an incident when L.B. was crying because Vicki B.'s son and A.B. had locked her out of the room. Laura told Michael B. and Vicki B. about the incident. Laura also recalled an incident when Vicki B.'s son threw L.B. on the ground and tickled her and then threw her on his shoulder and was slapping her rear. Laura told Michael B. that he needed to speak with Vicki B.'s son because the touching was inappropriate. Both Deborah and Stacey also testified that they observed Vicki B.'s son acting inappropriately with A.B. and L.B., including putting his arm between their legs and flipping them over his shoulder. Deborah did not believe the behavior was appropriate and encouraged Laura to talk to Vicki B. Stacey recalled that Vicki B. became very defensive when Laura mentioned this to Vicki B.

On cross-examination, Laura described Pratt as being gentle, kind, and good with animals. Laura stated that she was in charge of disciplining A.B. and L.B. when they lived with her. Laura testified that she believed A.B. and L.B. were lying about the alleged abuse to get out of trouble. Stacey also testified that she believed A.B. and L.B. were lying.

Pratt denied ever sexually molesting A.B. and L.B. and stated that the girls were lying. Pratt was informed of the allegations in a phone call from a detective in 2005 and was arrested in 2006.

Pratt recalled his last contact with A.B. and L.B. was in 2004, and A.B. and L.B. last spent a lot of time with the Pratts when they took them to Disneyland in 2000.

The testimony of A.B. and L.B. is both legally and factually sufficient evidence to support the jury's verdict. *See Glockzin v. State*, 220 S.W.3d 140, 147 (Tex. App.—Waco 2007, pet. ref'd); *Perez v. State*, 113 S.W.3d 819, 838 (Tex. App.—Austin 2003, pet. ref'd), *overruled on other grounds, Taylor v. State*, 268 S.W.3d 571 (Tex. Crim. App. 2008). Although there were some discrepancies between the history given to the sexual assault nurse examiner, Valerio's testimony, and the testimony of A.B. and L.B., the testimony by A.B. and L.B. was not so weak as to make the jury's verdict clearly wrong and manifestly unjust, and the jury's determination that A.B. and L.B. were credible witnesses is not against the great weight and preponderance of the evidence. The jury could reasonably have rejected the evidence Pratt presented in an effort to establish the lack of opportunity to commit the offenses, i.e., Laura being a light sleeper, the bedroom door being left open, and the dog sleeping in the room.

With regard to the date of the offenses, the indictment alleged the offenses occurred on or about the 12th day of October, 1995, and on or about the 12th day of October, 1996. Pratt contends that A.B. and L.B. lived with the Pratts before 1995; however, the "on or about" language of an indictment allows the State to prove a date other than the one alleged in the indictment as long as the date is prior to the presentation of the indictment and within the statutory limitation period. *Sledge v. State*, 953 S.W.2d 253, 256 (Tex. Crim. App. 1997); *Jones v. State*, 900 S.W.2d 392, 396 (Tex. App.—San Antonio,1995, pet. ref'd). Accordingly, even if the testimony established that the date of the offenses were prior to 1995 and 1996, the evidence is not legally or factually insufficient to support the jury's verdict.

## INEFFECTIVE ASSISTANCE

In his third issue, Pratt asserts that he received ineffective assistance of counsel. Specifically, Pratt complains trial counsel: (1) failed to conduct appropriate pretrial discovery and investigation; (2) made no efforts to exclude any extraneous conduct evidence that was introduced at sentencing; (3) did not speak with any witnesses prior to trial who had valuable information to provide and did not prepare witnesses who did testify; (4) failed to have a trial strategy or review evidence given to trial counsel by Pratt; (5) failed to object to hearsay testimony and inadmissible evidence; and (6) withdrew Pratt's application for probation thereby ending Pratt's chance of probation.

To succeed on an ineffective-assistance claim, the defendant must show that: (1) counsel's performance was deficient; and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Garza v. State*, 213 S.W.3d 338, 347 (Tex. Crim. App. 2007). To show deficient performance, the defendant must prove by a preponderance of the evidence that his counsel's representation fell below the standard of professional norms. *Garza*, 213 S.W.3d at 347-48. Appellate review of trial counsel's representation is highly deferential and presumes that counsel's actions fell within the wide range of reasonable and professional assistance. *Id*. at 348. To demonstrate prejudice, the defendant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id*. at 348.

Pratt presented his ineffective assistance claim to the trial court in a motion for new trial, and the trial court denied the motion for new trial after a hearing. We therefore analyze Pratt's ineffective assistance claim as a challenge to the denial of his motion for new trial. *Charles v. State*, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004), *superseded by rule on other grounds*, *State v. Herndon*, 215 S.W.3d 901 (Tex. Crim. App. 2007); *Shanklin v. State*, 190 S.W.3d 154, 158 (Tex.

App.—Houston [1st Dist.] 2005), *pet. dism'd*, 211 S.W.3d 315 (Tex. Crim. App. 2007).  In such circumstances, we review the *Strickland* standard through an abuse of discretion standard, and we reverse only if the trial court's decision is arbitrary or unreasonable, viewing the evidence in the light most favorable to the ruling.  *Shanklin*, 190 S.W.3d at 158-59.  A trial court abuses its discretion in denying a motion for new trial only when no reasonable view of the record could support the trial court's ruling.  *Charles*, 146 S.W.3d at 208.

A.      Failure to Conduct Appropriate Pretrial Discovery and Investigation/Trial Strategy

Pratt contends that his trial counsel failed to conduct appropriate pretrial discovery and investigation, including failing to speak to witnesses prior to trial who could have provided valuable information and failing to prepare witnesses for trial.  Pratt further contends trial counsel did not have a trial strategy.

An attorney representing a criminal defendant is charged with making an independent investigation of the facts of the case.  *Cantu v. State*, 993 S.W.2d 712, 718 (Tex. App.—San Antonio 1999, pet. ref'd).  This encompasses the duty to conduct a legal and factual investigation and to seek out and interview potential witnesses.  *Id*.  However, the duty to conduct an investigation is not absolute.  *Id*.  An attorney has the duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  *Id*.  We consider an attorney's decision not to investigate, or to limit the scope of investigation, with a great deal of deference to the attorney's judgment, looking to the reasonableness of the decision in light of the totality of the circumstances.  *Id*.

At the hearing on Pratt's motion for new trial, Paul Goeke, a board certified criminal defense attorney, testified as an expert witness.  Goeke testified that defense counsel in a sexual assault case

must interview the client, review the State's file, discuss the contents of the file with the client, and employ an investigator. Goeke also stated that the client should be informed of the punishment range. Goeke always has his clients undertake a polygraph and an independent psychiatric or psychological evaluation. Goeke obtains school and other records regarding the victim, reads through any information provided by the client, and talks with any witnesses suggested by the client.

Pratt testified that trial counsel never discussed the punishment range for the offense with him; however, Pratt admitted that he knew the range of punishment based on information from the magistrate. Pratt further testified that trial counsel never discussed the witness list Pratt gave him; however, Pratt admitted that trial counsel contacted two of the listed witnesses who were called to testify at trial. Pratt stated that trial counsel never discussed hiring an investigator, and although Pratt offered to take a polygraph test, one was never done. Although Pratt took a large box of information to trial counsel, Pratt stated only two photographs from the box were admitted into evidence. On cross-examination, Pratt admitted that two letters between Pratt and his step-granddaughters also were introduced into evidence. Although Pratt paid trial counsel $2,500 to retain Jack Ferrell to review a video and witness statements, Ferrell was not retained, and trial counsel did not have any notes regarding his meeting with Ferrell. Trial counsel also failed to introduce into evidence A.B.'s MySpace page which contained references to drug use.

Initially, we note that Pratt fails to detail what information or evidence trial counsel failed to obtain or how it would have been beneficial to his case. *See Cochran v. State*, 78 S.W.3d 20, 25 (Tex. App.—Tyler 2002, no pet.); *Thompson v. State*, 915 S.W.2d 897, 906 (Tex. App.—Houston [1st Dist.] 1996, pet. ref'd). For example, Pratt criticizes defense counsel's failure to contact several witnesses; however, Pratt never details what information those witnesses would have provided that

would have been more beneficial to Pratt than the information provided by the witnesses who did testify. In addition, Pratt asserts defense counsel was ineffective for failing to retain an investigator, but Pratt does not detail what beneficial information an investigator would have been able to obtain.

Trial counsel testified that he did explore the idea of retaining Dr. Jack Ferrell, a forensic psychologist who deals with children, as an expert witness; however, after reviewing the file and discussing the case with trial counsel for about an hour, Dr. Ferrell told trial counsel that he could not help him. Trial counsel stated that he asked Dr. Ferrell to review the case and determine whether there were any credibility issues with the witness statements or the forensic interview.

Trial counsel further testified that he had numerous conversations with the detective investigating the case. When trial counsel told the detective that Pratt would not be willing to give a statement without trial counsel being present, the detective responded that he did not want to talk to Pratt if Pratt was "going to lawyer up."

Trial counsel did not recall Pratt asking to take a polygraph exam, but counsel does not recommend them because they are not admissible. Trial counsel also did not recommend a plethesmograph or an Abel assessment because Pratt denied abusing A.B. and L.B. Trial counsel would only use that testing in the event the client admitted engaging in the behavior to establish that the client was not a sexual predator. Counsel further testified that he did not believe an investigator was necessary given the nature of the case. Trial counsel stated that he did make notes from the State's file although the notes were not in his file. Trial counsel testified that he met with Pratt on numerous occasions, reviewed the State's file, reviewed the videotaped interview and the witness statements, and spoke to witnesses. Counsel stated that he did not call one witness mentioned by the Pratts because the witness stated that Pratt tried to grope her when he was drunk. Trial counsel

stated that he did review the information in the box Pratt brought to him, and that he did introduce two letters A.B. or L.B. sent that were in the box.

Trial counsel also testified regarding his trial strategy: he intended to establish inconsistencies in the testimony; and he intended to focus on the incidents involving Vicki B.'s son.

B.      Failure to Convey Plea Offers

Pratt asserts that trial counsel never discussed the State's plea offer with him until the day of trial. The plea offer was for ten years. Pratt testified that trial counsel never explained the plea offer to him in terms of the range of punishment. Pratt also testified counsel never explained whether he was eligible for probation. On cross-examination, however, Pratt admitted that he was unwilling to plead guilty or no contest, and he chose to go to trial.

Trial counsel testified that he informed Pratt of the plea bargain offer, and Pratt told him he would never plead or admit that he did something. Counsel stated that he explained the plea process to Pratt, and Pratt told him that he did not want to accept probation if he had to admit responsibility for engaging in the sexual acts. Counsel testified, "John was not going to take any offer. He was not going to stand up there and say no contest or guilty. That was his position."

C.      Failure to Object to Hearsay Testimony

Pratt further contends that trial counsel failed to object to Valerio's testimony which was entirely hearsay. Trial counsel stated that he did not object on the basis of hearsay because he wanted to focus on the inconsistent statements. Trial counsel testified that some of the details in Valerio's testimony were inconsistent with A.B.'s statement, including inconsistencies in the location where the offenses occurred. He also testified that he used Valerio's statement for impeachment purposes. He disagreed that A.B.'s videotaped statement contained the same

inconsistencies as Valerio's testimony. Trial counsel believed that the inconsistencies brought out through Valerio's testimony made Pratt's defense stronger.

D.      No Effort to Exclude Extraneous Conduct Evidence at Sentencing

Pratt next contends that trial counsel failed to make any efforts to exclude extraneous conduct evidence at sentencing. The additional conduct about which Pratt complains was that Pratt would make A.B. smell his hand after touching her and make her smell his penis. This evidence was properly admitted, however, because the State can add additional details regarding the offense at punishment that are not admitted during guilt/innocence. *See* TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(a)(1) (Vernon 2006) (providing trial court may admit evidence regarding circumstances of the offense for which defendant is being tried at punishment phase of trial).

E.      Failure to Proffer Favorable Evidence at Sentencing

Pratt asserts that trial counsel failed to present favorable evidence at sentencing that was provided to him, including accounts Pratt opened for A.B. and L.B. and military awards he received.

Trial counsel stated that Pratt had already testified regarding his military service during the guilt/innocence phase of trial. Counsel also stated that he decided not to call witnesses at sentencing because the witnesses would have testified to the same information they provided at the guilt/innocence phase of trial. Trial counsel discussed the possibility of calling Laura as a witness during punishment to discuss her health condition and her need for Pratt in the home, but Pratt stated that he did not want Laura called to the stand.

F.      Withdrawn Probation Application

Pratt further complains that trial counsel withdrew his application for probation, thereby ending Pratt's chance of probation. Trial counsel testified that he discussed withdrawing the

application with Pratt. Both trial counsel and Pratt believed that the jury was not going to give Pratt probation. Trial counsel testified that Pratt's only chance to get probation was to take responsibility, and Pratt refused to accept responsibility.

Trial counsel summarized his reasons for withdrawing the probation application as follows, "one, John was not going to take the stand and admit responsibility for the application – on the application for probation. Two, I felt the jury, as did John, felt that the jury was not going to give him probation. Three, I figured I could use that [the withdrawing of the application] to show that he accepted responsibility for his actions." Counsel stated that based on his experience, the jury would not assess probation unless Pratt accepted responsibility.

G.      Closing Arguments

Finally, Pratt complains about the 11-line closing argument trial counsel gave at the conclusion of the punishment hearing. Trial counsel stated that he referred to any sentence being a death sentence for Pratt, who was 68 years old at the time of trial, in an effort to reach any jurors opposed to the death penalty. Trial counsel stated he was trying to get the jury to think that any sentence would be a death sentence. Since Pratt would not accept responsibility, trial counsel decided to accept responsibility by informing the jury that Pratt accepted their verdict. Therefore, counsel's focus during closing argument was to make the jury believe that Pratt accepted responsibility and to emphasize that any sentence would be a "death" sentence given Pratt's age.

H.      Conclusion

Constrained by the applicable standard of review, we must view the evidence in the light most favorable to the trial court's ruling. *See Shanklin*, 190 S.W.3d at 158-59. Although some of the evidence is conflicting, we must defer to the trial court's resolution of those conflicts. *See id.*

The fact that another attorney might have pursued a different course of action or tried the case differently will not support a finding of ineffective assistance of counsel. *Dickerson v. State*, 87 S.W.3d 632, 637 (Tex. App.—San Antonio 2002, no pet.). Given trial counsel's testimony explaining the reasons for the actions he took or refrained from taking, the trial court could have determined that trial counsel was not deficient in his performance and had a trial strategy. Therefore, although the defensive course chosen by counsel might not have been as complete or detailed as the course that would have been taken by the expert who testified at the motion for new trial hearing, the trial court did not abuse its discretion in determining that counsel's actions had a plausible basis. *See id*. (noting any error in trial strategy will be deemed inadequate representation only if counsel's actions lack any plausible basis).

## CONCLUSION

The trial court's judgments are affirmed.

Catherine Stone, Chief Justice

DO NOT PUBLISH