

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-12-00080-CR

_____

LOLA DANIELLE CHERRY, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 354th District Court
Hunt County, Texas
Trial Court No. 27792

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Chief Justice Morriss

MEMORANDUM OPINION

Medical personnel determined that the twelve-week-old daughter of Lola Danielle Cherry was in severe respiratory distress because of a baby wipe Cherry later admitted to having placed deep in the baby's throat. Cherry appeals the resulting conviction and twenty-four-year sentence for attempted capital murder of that infant daughter on the basis that her oral and written confessions were not voluntarily given. Because the trial court did not abuse its discretion in finding that the confessions were voluntarily made, we affirm Cherry's conviction and sentence.

In the fall of 2009, Cherry's infant daughter, whom we will refer to as Janine, was found to be gasping, choking, and generally having great difficulties breathing. Paramedics were summoned—the child was taken first to a hospital in Greenville then flown to a Dallas hospital. Finally, a baby wipe was removed from the back of the child's throat. Two physicians testified it was not possible for a child of that age to put the wipe that far back in her own throat. As a result of this incident, Janine was taken into the custody of Child Protective Services (CPS).

About two months after the hospitalization of the child and removal of the baby wipe, Cherry was interviewed by United States Secret Service agents[1] who were reportedly assisting in the investigation with the Greenville Police Department. Agent Woodward testified that Cherry, in the course of the interview, told him she had put the baby wipe in Janine's throat; Cherry then

---

[1]Exactly why Secret Service agents were involved is not clear. In the affidavit for an arrest warrant executed by Detective Felicia White of the Greenville Police Department, White said United States Special Agent Ron Woodward administered a polygraph examination to Cherry in the course of the police investigation. The affidavit further stated Cherry had "failed the examination," after which Woodward obtained from Cherry the admissions at issue here. Woodward testified he occasionally helped local law enforcement in their investigations.

2

wrote a three-page statement admitting to the act.[2]  In her written statement, eventually admitted into evidence, Cherry stated that she put a wipe in the child's throat and went back to bed, that she did this because she was "extremely depressed," that she did not tell anyone about her act because she feared she would not be able to see Janine again and would not get help for her depression, that she did not want to worry about supporting the child, and that she felt the child would be "safer with [G]od."

In an attempt to show that her statements to Woodward were coerced, Cherry points out that she was seventeen years old at the time of the interview and had completed only the seventh grade.[3]  She stresses that she gave the statement inside the Greenville Police Department, behind at least one locked door, and that, thus, she did not feel free to leave.  She also claims she felt intimidated by Woodward and his fellow Secret Service agent, whom Cherry understood "protect[ed] the president."  She also makes a number of claims specific to her situation allegedly rendering her susceptible to coercion:

- The agents told her what to put in the written statement.  ("Like, I didn't know what or how to write this.  And, you know, I asked them, Well, you know, How -- how do I start? You know, and they told me that I would say, you know, that I wanted -- I wish to make this certain statement.  And that I just state on, you know, October 31st, you know, and so forth.")

- She made the written statement because she "felt that it was the way to get [her] child back quicker"; she also said that, in making the written statement, she was "just trying to

---

[2]Cherry did not object to Woodard's testimony that Cherry told him she had put the wipe in the infant's mouth; she lodged an objection only when the State offered the written statement into evidence.  Her brief is not completely clear as to whether she challenges the admission of the oral or the written statement; but, based on her cross-examination of witnesses and her own trial testimony, we interpret her appellate point to complain of the admission of both statements on the ground they were not made voluntarily.

[3]Cherry did say she had taken classes in eighth and ninth grades, but completed only the seventh grade.

say what [she] needed to say to hurry up and get it over with so [she] could have [her] child back."

- The agents told her "[t]hat[,] if [she] told them what happened, that it wouldn't take long. They would get [her] help and that [she] could have [her] child back within six to eight months."

- This "help" would be for her depression, referenced in the written statement.

- At fifteen or sixteen years of age, she had become pregnant by a twenty-nine-year-old man; the State called her to testify against that man, and she felt then that, if she did not cooperate with the prosecution, she herself would be in trouble. The infant with whom she was pregnant in that situation was stillborn.

- She was worried about CPS. They assigned her "classes and, you know, things that [they] could do to get [Janine] back." If they did not complete these assigned classes, Cherry believed she and the father "would lose [their] rights" to Janine. She believed that, if they did not cooperate, she would never be able to "be in [the child's] life again."

- Cherry believed she had been "ordered" by the judge in the CPS case to talk to the Secret Service agents (discussed in greater detail below).

Agent Woodward acknowledged that Cherry could not just walk out of the interview room; it was behind at least one locked door. Woodward testified that he advised Cherry of her *Miranda*[4] rights and that she had initialed a form acknowledging she understood those rights and voluntarily waived them. Cherry was shown a document identified as State's Exhibit 14 and agreed she had initialed the document, indicating she understood and waived her rights to have an attorney and to cease the interview.[5] Woodward stated Cherry was not handcuffed. When asked if she was under arrest, he stated, "Not that I was aware of." He did not remember taking

---

[4]*Miranda v. Arizona*, 384 U.S. 436 (1966).

[5]This exhibit was not admitted into evidence.

4

notes, and the interview was not recorded. After the interview, Cherry was allowed to leave on her own, as far as he was aware. Woodward did not remember discussing Cherry's CPS case during his interview with Cherry. Woodward then met with Detective White to discuss the interview. Cherry testified that, as she left the interview, White told her she would not get an arrest warrant until after the Christmas and New Year holidays (the interview was December 22, 2009). Cherry testified that she turned herself in for arrest when she was called by White, which, from the context of the testimony, appears to have been sometime after the holidays.[6]

Regarding the CPS case, Cherry said an attorney had been appointed to her for that litigation. However, that attorney did not accompany her to the Woodward interview. Cherry testified that, at one of the CPS hearings, Cherry and Kennton Gray (Janine's father) were "ordered by the Court, CPS, they ordered us to go and talk with them [the Secret Service agents]." However, when asked if she ever saw a written order from the CPS judge to this effect, Cherry conceded she had not; rather, when asked if "the Judge told you to go do it," that is, meet with Woodward and the other agent, Cherry replied, "She just agreed to it. You know, the CPS people insisted on it, and the judge agreed . . . ." Cherry's CPS attorney agreed as well. Cherry claimed she was never told she did not have to participate in this meeting. When asked by the State on cross-examination if she was "ordered" by the CPS judge to meet with the agents, Cherry testified, "Yes. The CPS people suggested it and said that this is what they were asking

---

[6]Cherry was reportedly not under arrest during the interview; her brief raises only the issue of voluntariness of the statements, but, at oral argument, she suggested she could be deemed to have been in custody at the time she gave the statements. We will not analyze whether she was in custody, because Article 38.22, Section 6 applies whether a statement is custodial or non-custodial. *State v. Terrazas*, 4 S.W.3d 720, 727 (Tex. Crim. App. 1999); *see also Oursbourn v. State*, 259 S.W.3d 159, 171 (Tex. Crim. App. 2008); TEX. CODE CRIM. PROC. ANN. art. 38.22, § 6 (West 2005). Also, Cherry acknowledged, and it is uncontested, that Cherry was given her *Miranda* warnings.

5

and she said, I'll allow it -- or I'm not sure if those were her exact words, but she approved for that to be done. So I assumed that it was court ordered." Cherry testified that her appointed attorney (for the CPS case) was with her at that time and that her attorney told her that, if she did not cooperate with the investigating agents, "it would only make me look guilty."

If a question is raised regarding the voluntariness of a statement, the trial court "must make an independent finding . . . as to whether the statement was made under voluntary conditions." TEX. CODE CRIM. PROC. ANN. art. 38.22, § 6.[7] If the trial court finds the statement to have been made voluntarily and, thus, admissible, the trial court must then "enter an order stating its conclusion" that the statement was made voluntarily, and also must make "specific finding of facts upon which the conclusion was based." *Id.*[8] We review the trial court's findings on the voluntariness of a statement under an abuse of discretion standard. *Cantu v. State*, 817 S.W.2d 74, 77 (Tex. Crim. App. 1991). We look to the totality of the circumstances surrounding the acquisition of a statement to determine whether it was made voluntarily. *Delao v. State*, 235 S.W.3d 235, 239 (Tex. Crim. App. 2007). The trial court is the sole judge of the credibility of the witnesses and the weight of their testimony. *Wyatt v. State*, 23 S.W.3d 18, 25 (Tex. Crim. App. 2000). We will not disturb a trial court's finding that is supported by the record. *Garza v. State*, 213 S.W.3d 338, 346–47 (Tex. Crim. App. 2007).

---

[7]Section 6 is mandatory. *Urias v. State*, 155 S.W.3d 141, 142 (Tex. Crim. App. 2004). Accordingly, we abated this matter to the trial court for the required order and findings of fact. *But see id.* at 143 (Keller, P.J., dissenting from denial of reh'g) (acknowledging uncertainty of law and suggesting more guidance be given as to whether this is one of few errors not forfeitable); *see also Hernandez v. State*, 387 S.W.3d 881, 887–88 (Tex. App.—San Antonio 2012, no pet.)

[8]If the trial court concludes the statement was involuntarily made, the requirement of an order and findings of fact is not engaged. *See Terrazas*, 4 S.W.3d at 727–28.

The voluntariness of Cherry's statements boils down to a determination of credibility, that is, whether the trial court believed her description of the situation and the claimed representations to her. Above, we outlined Cherry's testimony wherein she described her opinions about why she made the inculpatory statements to Woodward. The trial court was best suited to observe Cherry, Woodward, and the rest of the witnesses.

There were other pieces of testimony that could have been relevant to determining Cherry's credibility. Dr. Joseph Bleier, at the hospital in Greenville, where Janine was first taken, testified that Cherry told him

> that the child had been lying in his[9] crib or a bed on his stomach. Beneath his head she had placed a diaper wipe -- I don't remember for what purpose -- and that [Cherry] awoke to find the child in respiratory distress and she believed that he had inhaled this diaper wipe.

Bleier found this "suspect" and opined the child was "too small and not strong enough to inhale a large diaper wipe relative to the patient's size, much less inhale it to the point where it was actually in his throat, not just in the mouth." Cherry, though, denied telling anyone she thought the child had ingested a baby wipe or that there were wipes in the crib and specifically testified that Bleier lied in his testimony. Additionally, while the recording of Cherry's call to 9-1-1 contains two instances of Cherry stating that she thinks there may be something stuck in the child's throat, none of the responding emergency personnel recalled Cherry saying anything to that effect when they arrived and were treating the infant. Gray, Janine's father and the boyfriend of Cherry, testified at trial he felt nothing in the child's mouth when he ran his finger

---

[9]Bleier, several times, referred to Janine with a male pronoun, but the doctor did confirm that he was mistaken and that the infant patient was a female.

7

through it, but Cherry's testimony and written statement asserted Gray had told her he did feel something. Nonetheless, she did not relay this information to any of the medical personnel treating the baby. According to Cherry, Gray commented that he had told medical personnel he had felt something in the child's mouth.

Also, despite Cherry's representations that she felt intimidated or coerced by Woodward and the CPS judge, Gray testified that Cherry was "pretty smart" and "not really" easily intimidated. When Cherry testified, the trial court asked her about her having been rearrested, about nine months after the arrest for the instant charge. Cherry told the court her bondsperson went off Cherry's bond because "she didn't approve of some of the things that was going on." The State then asked a follow-up question, leading Cherry to clarify she had been back in jail because she "caught a new drug charge," which led to her arrest for a felony.

The trial court found Cherry's statements to have been made voluntarily. The court made findings of fact, including:

- Cherry voluntarily went to the Greenville Police Department for an interview with Detective White, Agent Woodward, and another Secret Service agent;

- There was no credible evidence Cherry was ordered by the CPS judge to participate in the interview;

- Cherry was given *Miranda* warnings before the questioning and signed a written waiver of her rights;

- Before questioning, Woodward inquired into Cherry's mental capacity and whether she understood the questioning process;

- Cherry was not handcuffed during the interview;

8

- There was no credible evidence Woodward made any false promise to Cherry she would not be arrested or charged with the alleged crime against Janine;

- During the interview, Cherry never asked for an attorney or refused to answer questions;

- Cherry had an opportunity to review her written statement before signing it; and

- Cherry left the police department after the interview and was not arrested for more than a week.

The trial court concluded, considering the totality of the circumstances, that Cherry's oral and written statements to Woodward were made voluntarily. The trial court also stated that Cherry was "less than candid with the Court" during her testimony.

The record supports the trial court's finding that Cherry voluntarily made her oral and written statements. There is no abuse of discretion in the trial court's findings, and we overrule Cherry's point of error.

We affirm the trial court's judgment and sentence.


Josh R. Morriss, III
Chief Justice

Date Submitted:       August 26, 2013
Date Decided:         August 30, 2013

Do Not Publish