# Court of Appeals
## Tenth Appellate District of Texas

---

### 10-24-00191-CR

---

Justin Hopper,
Appellant

v.

The State of Texas,
Appellee

---

On appeal from the
272nd District Court of Brazos County, Texas
Judge John L. Brick, presiding
Trial Court Cause No. 20-04042-CRF-272

---

CHIEF JUSTICE JOHNSON delivered the opinion of the Court.

### MEMORANDUM OPINION

A jury found Appellant, Justin Hopper, guilty of the felony offense of injury to a child causing serious bodily injury. The jury assessed his punishment at confinement for life. The trial court sentenced Hopper accordingly. This appeal ensued. In four issues, Hopper argues that the evidence was insufficient to support his conviction and that he received ineffective assistance from his trial counsel. We will affirm.

## A. Background Facts

On October 27, 2020, Daniel Green and Brady Young, paramedics with the Bryan Fire Department, responded to a call of a six-year-old in cardiac arrest at Hopper's residence. Hopper lived at the residence with his fiancée, Jessica Bundren, his six-year-old twin daughters, A.B. and P.B., and Bundren's adult son, Dylan. Hopper told the paramedics that A.B. had fallen down the stairs twenty minutes prior. The paramedics found A.B. lying flat on her back in the middle of the room with her arms at her sides. Green noticed significant facial bruising, including "raccoon eyes" which is consistent with basilar or skull fracture. The paramedics assessed A.B. and determined that she was already deceased and that life-saving measures would be futile. They also observed several bruises that appeared to be in various stages of healing and that A.B.'s body was cold to the touch, which was inconsistent with Hopper's claim that she had been alive twenty minutes before paramedics arrived. The paramedics did not believe that A.B.'s injuries were consistent with falling down the stairs.

Multiple officers and detectives from Bryan Police Department arrived on scene. One officer spoke with P.B., who was complaining of pain and stated she had been hit by a paddle by her dad. A search warrant was obtained and officers found a heavy wooden paddle in one of the bedrooms. DNA analysis of

the paddle determined that A.B. was a possible contributor to a stain on the body of the paddle and that Hopper, Bundren, and A.B. were possible contributors to a DNA profile from the handle of the paddle.  A belt was also located in the bedroom where A.B.'s body was found, and rivets on the belt were consistent with marks on A.B.'s skin.

Dr. Lucas Wieck, a medical examiner with the Travis County Medical Examiner's Office, conducted an autopsy on A.B.'s body.  Dr. Wieck observed and documented extensive injuries to A.B.'s entire body, including:

- fourteen abrasions and bruises to A.B.'s face, many of which were commingled and overlapping, indicating multiple impacts to her face,

- injuries near her ears and eyes, including bleeding around her eyes,

- blunt trauma injuries to the front, back, and sides of her scalp and bleeding within the outer and inner membranes that surrounded her brain,

- bruising on the left side and back of her neck,

- multiple abrasions and bruises on the front and back of her torso, her arms, and her legs,

- numerous areas of bleeding on her chest, abdomen, and back; and

- bleeding within her colon.

Dr. Wieck concluded that A.B.'s cause of death was blunt trauma and manner of death was homicide. He also concluded that she died as a result of all of her injuries, rather than a single blow. Dr. Wieck was unable to precisely date A.B.'s injuries, but he noted evidence of inflammation in some of her injuries, consistent with healing.

Hopper and Bundren were both charged with injury to a child causing serious bodily injury. Bundren was tried prior to Hopper and was found guilty.

## B. Sufficiency of the Evidence

In his first three issues, Hopper challenges the sufficiency of the evidence to support his conviction and the deadly weapon finding.

### 1. Standard of Review

The Court of Criminal Appeals has defined our standard of review of a sufficiency issue as follows:

> When addressing a challenge to the sufficiency of the evidence, we consider whether, after viewing all of the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017). This standard requires the appellate court to defer "to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. We may not re-weigh the evidence or substitute our judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). The court conducting a sufficiency review must not engage in a "divide and conquer"

strategy but must consider the cumulative force of all the evidence. *Villa*, 514 S.W.3d at 232. Although juries may not speculate about the meaning of facts or evidence, juries are permitted to draw any reasonable inferences from the facts so long as each inference is supported by the evidence presented at trial. *Cary v. State*, 507 S.W.3d 750, 757 (Tex. Crim. App. 2016) (citing *Jackson*, 443 U.S. at 319); *see also Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007). We presume that the factfinder resolved any conflicting inferences from the evidence in favor of the verdict, and we defer to that resolution. *Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012). This is because the jurors are the exclusive judges of the facts, the credibility of the witnesses, and the weight to be given to the testimony. *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010). Direct evidence and circumstantial evidence are equally probative, and circumstantial evidence alone may be sufficient to uphold a conviction so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015); *Hooper*, 214 S.W.3d at 13.

We measure whether the evidence presented at trial was sufficient to support a conviction by comparing it to "the elements of the offense as defined by the hypothetically correct jury charge for the case." *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge is one that "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.*; *see also Daugherty v. State*, 387 S.W.3d 654, 665 (Tex. Crim. App. 2013). The "law as authorized by the indictment" includes the statutory elements of the offense and those elements as modified by the indictment. *Daugherty*, 387 S.W.3d at 665.

*Zuniga v. State*, 551 S.W.3d 729, 732–33 (Tex. Crim. App. 2018).

2. Issues One and Two

Hopper's first and second issues address the sufficiency of the evidence supporting different theories under which the jury could have found him guilty of the offense of injury to a child, so we will address these issues together.

In his first issue, Hopper argues that the evidence is insufficient to support his conviction for injury to a child by intentionally or knowingly causing serious bodily injury to A.B., a child of 14 years of age or younger. Hopper states that there is insufficient evidence to support the State's theory that Hopper, as a principal, caused serious bodily injury to A.B. with the paddle. Specifically, Hopper argues that besides inference from Bundren's testimony in her own criminal trial facing the same charges as Hopper, there is no direct evidence tying Hopper to the paddle on October 27, 2020. However, direct evidence is not the only evidence a jury may consider. Direct evidence and circumstantial evidence are equally probative, and circumstantial evidence alone may be sufficient to uphold a conviction so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Ramsey*, 473 S.W.3d at 809; *Hooper*, 214 S.W.3d at 13. Additionally, although juries may not speculate about the meaning of facts or evidence, juries are permitted to draw any reasonable inferences from the facts so long as each inference is supported by the evidence presented at trial. *Cary*,

507 S.W.3d at 757; *see also Hooper*, 214 S.W.3d at 16–17. Additionally, Hopper argues that the evidence is insufficient to convict him as a party. Specifically, he focuses on the text messages between Bundren and Hopper and states that the messages do not show that Hopper was encouraging, promoting, or aiding Bundren in her abuse of A.B. In his second issue, Hopper argues that the evidence is insufficient to support Hopper's conviction for injury to a child by omission by failing to protect A.B., a child of 14 years of age or younger, from injury from another or by failing to seek prompt medical treatment for her injuries.

The indictment and jury instructions set forth six different alternate theories of guilt, specifically that Hopper, either acting alone or as a party, intentionally or knowingly: (1) caused serious bodily injury to A.B. by striking her with his hand; (2) caused serious bodily injury to A.B. by striking her with a belt; (3) caused serious bodily injury to A.B. by striking her with a hard object; (4) caused serious bodily injury to A.B. by causing her to strike a hard object; (5) by omission, caused serious bodily injury to A.B. by failing to protect her from injury from another when he had a statutory or legal duty to act; (6) by omission, caused serious bodily injury to A.B. by failing to seek prompt medical treatment for her injuries when he had a statutory or legal duty to act. "[W]hen multiple theories are submitted to the jury, the evidence is sufficient to support

a conviction so long as the evidence is sufficient to support conviction for one of the theories submitted to the jury." *Guevara v. State*, 152 S.W.3d 45, 52 (Tex. Crim. App. 2004) (citing *Kitchens v. State*, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991)).

The record contains evidence from which a jury could have reasonably inferred that Hopper had knowledge of and encouraged Bundren's actions leading to and surrounding the injury and ultimate death of A.B. To determine whether an individual is a party to an offense, the reviewing court may look to events before, during, and after the commission of the offense. *Gross v. State*, 380 S.W.3d 181, 186 (Tex. Crim. App. 2012). There must be sufficient evidence of an understanding and common design to commit the offense. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004). The State introduced text messages back and forth between Bundren and Hopper in the weeks leading up to A.B.'s death. In many of the text messages, Bundren describes her frustrations with P.B. and A.B., usually about the children not eating quickly enough or urinating or defecating on the floor. Bundren also tells Hopper what she is doing to punish the children, including striking the children and withholding food. Hopper's responses include apologizing to Bundren, telling her to "stay calm" or "stay strong" or to "keep up the good work." On September 15, 2020, Dylan texted Hopper to tell him that Bundren was going "overboard"

on P.B., and Hopper responded that P.B. was "askin [sic] for it." During one exchange between Bundren and Hopper from October 8, 2020, Bundren said "It is what it is. They are testing me again. I have to stay consistent. If they like getting swats until their bottoms are purple then so be it." and "[A.B.] is on a roll today – not doing what she is told. She just got another spanking." Hopper responded by saying, "Yeah fuck them rite [sic] now." On October 20, 2020, Bundren sent a photo of one of the girls with a text saying "look who just got a spanking for crying instead of eating," to which Hopper responded, "I'm so tired of there [sic] shit." Later that day, Bundren told Hopper that Dylan got angry that Bundren was spanking Arianna, and Hopper asked, "did you tell him to shut up." On October 21, 2020 and October 23, 2020, Hopper tells Bundren to tell the children he will spank them when he gets home for not listening to Bundren. On October 24, 2020, Hopper sent Bundren a photo of a paddle and stated he had just made it. Bundren responded by saying "That's nice! Although I hate that we have to use it. I wish they would just straighten up and follow the rules." P.B. testified that Bundren would spank her and A.B. with a belt.

The record also contains evidence from which a jury could have reasonably concluded that Hopper's own actions lead to the injury and ultimate death of A.B. In her testimony during her own trial, which was read into the

record during Hopper's trial, Bundren claimed that on October 27, 2020, Hopper arrived at the residence at lunchtime, took A.B. to her bedroom, closed the door, and when he came out, handed Bundren the paddle, said he had to go to work and told Bundren to check A.B. for urine. Ring doorbell footage shows Hopper got to the residence at about 2:00 pm and left at approximately 2:42 pm. Hopper reentered the residence at 2:43 pm and left at 2:55 pm. The record shows that after Hopper left, he and Bundren exchanged messages about the children, including one around 3:00 pm that A.B. had defecated in her underwear. At about 4:50 pm, Bundren texted Hopper that while being spanked, A.B. kept rolling on her back and defecating on the bed and floor. Hopper told Bundren to put her in the shower and he would deal with her when he got off work. Bundren also said that A.B. kept falling and hitting her head, that Bundren put A.B. in the shower twice but took her out so she wouldn't get too cold, and that Bundren put A.B. on the floor with clothes but she "is just lying there." Hopper told Bundren to put A.B. on the toilet if she couldn't stop defecating. Around 5:10 pm, Bundren texted saying that A.B. "is fine just needs a nap" and that Bundren tried to give A.B. ibuprofen, but A.B. spit it out. The Ring doorbell footage shows Hopper arrived back to the residence at 5:20 pm. P.B. told officers on scene that Hopper had used the paddle to strike her and testified at trial that Hopper spanked both her and A.B. with the

paddle. Dr. Evan Matshes, a forensic pathologist, testified that the paddle found on scene was consistent with causing many of the injuries on A.B.'s body.

Weighing all of the evidence and testimony presented, a rational jury could have inferred that that Hopper, as a principal actor, caused serious bodily injury to A.B. by striking her with the paddle. A rational jury could also have found that Hopper acted as a party to Bundren's actions that caused serious bodily injury to A.B.

Considering the foregoing evidence viewed in light most favorable to the verdict, we conclude that the evidence supports the jury's reasonable finding that Hopper caused serious bodily injury to A.B., either as a principal or a party. Since the evidence is sufficient to support Hopper's conviction under theories that he acted as a principal or as a party to the commission of the offense, we need not address whether the evidence was sufficient under the theories of guilt by omission. *See Guevara*, 152 S.W.3d at 52. Accordingly, we overrule Hopper's first and second issue.

3. Issue Three

In his third issue, Hopper argues that the evidence is legally insufficient to support the deadly weapon finding for injury to a child by omission by the failure to promptly seek medical treatment and failure to intervene to protect A.B. from harm by another. As outlined above, there were multiple theories

on which the jury could have convicted Hopper both by commission, as a principal actor or a party to the offense, or by omission. Hopper only argues that there was insufficient evidence of a deadly weapon finding under the theories of omission, but he does not argue sufficiency to support the deadly weapon finding under the theories of commission. An appellate court will refrain from conducting a sufficiency of the evidence review when the defendant fails to attack all theories of conviction submitted alternatively to the jury. *See Kitchens*, 823 S.W.2d 259. Accordingly, we overrule Hopper's third issue.

## C. Ineffective Assistance of Counsel

In his fourth issue, Hopper argues that trial counsel provided ineffective assistance of counsel at the pretrial and trial stages with no plausible trial strategy.

## 1. Authority

The Sixth Amendment to the United States Constitution, and section ten of Article 1 of the Texas Constitution, guarantee individuals the right to assistance of counsel in a criminal prosecution. *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011). The right to counsel necessarily requires the right to effective assistance, not just the mere presence of a lawyer. *Id.* However,

the right does not provide a right to errorless counsel, but rather to objectively reasonable representation. *Id.*

To prevail on a claim of ineffective assistance of counsel, an appellant must meet the two-pronged test established by the U.S. Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984). *Hernandez v. State*, 726 S.W.2d 53, 55–56 (Tex. Crim. App. 1986) (adopting the two-pronged test set forth in *Strickland*). An appellant must show that (1) counsel's representation fell below an objective standard of reasonableness and (2) the deficient performance prejudiced the defense such that there is a reasonable probability that the result of the proceeding would have been different. *Lopez*, 343 S.W.3d at 142; *Hernandez*, 726 S.W.2d at 55. In assessing effective assistance of counsel, we must review the totality of the representation and the circumstances of each case without the benefit of hindsight. *Lopez*, 342 S.W.3d at 142–43. While a single error will not typically result in a finding of ineffective assistance of counsel, an egregious error may satisfy the *Strickland* prongs on its own. *Id.* at 143.

2. Analysis

Hopper argues that his trial counsel was ineffective for several reasons, specifically: (1) in his response to a juror fainting and failing to inquire whether the attending paramedic was the State's witness, Daniel Green, a

paramedic for the Bryan Fire Department; (2) by failing to request a Rule 705 hearing as to Green's qualifications; (3) by failing to request a Rule 705 hearing as to the reliability of Matshes's opinions; (4) by failing to object to Liza Dyess's testimony under Rules 702 and 403; (5) by filing "*Ake* Motions" publicly rather than under seal; (6) by admitting and reading from Bundren's testimony; (7) by failing to object to certain sections of the charge; and (8) by failing to request a hearing on the State's request that P.B. be allowed to testify via closed circuit television.

Appellate review of trial counsel's representation is highly deferential and presumes that counsel's actions fell within the wide range of reasonable and professional assistance. *Garza v. State*, 213 S.W.3d 338, 348 (Tex. Crim. App. 2007). If counsel's reasons for his conduct do not appear in the record and there is at least the possibility that the conduct could have been grounded in legitimate trial strategy, we will defer to counsel's decisions and deny relief on an ineffective assistance claim on direct appeal. *Id.* Ineffective assistance of counsel claims are not built on retrospective speculation; they must "be firmly founded in the record." *Bone v. State*, 77 S.W.3d 828, 835 (Tex. Crim. App. 2002). That record must itself affirmatively demonstrate the alleged ineffectiveness. *Id.* Here, counsel's reasons for his actions or intentions do not

appear in the record, and his conduct could have been part of a reasonable trial strategy.  Without more, we must defer to counsel's decisions and deny relief.

Therefore, we overrule Hopper's fourth issue.

## D. Conclusion

Having overruled Hopper's four issues, we affirm the judgment of the trial court.

 

 

_____
MATT JOHNSON
Chief Justice

OPINION DELIVERED and FILED:  May 28, 2026

Before Chief Justice Johnson,
      Justice Smith, and
      Justice Harris
Affirmed
Do Not Publish
CRPM

